United States Court of Appeals
Fifth Circuit

**F I L E D**

**June 16, 2003**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 02-10434
_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

TOMMY SIMPSON; PAUL MILLS,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Northern District of Texas

_____

Before JOLLY, WIENER, and BARKSDALE, Circuit Judges.

WIENER, Circuit Judge:

Defendant-Appellants Tommy Simpson and Paul Mills were convicted of conspiracy to manufacture, and possession with the intent to distribute, 500 grams or more of methamphetamine. On appeal, they contest the district court's six-level sentence enhancement under § 2D1.1(b)(5)(C) for causing a substantial risk of harm to the life of a minor. We are convinced that the district court erroneously applied the six-level enhancement to Paul Mills's sentence because there was neither evidence of the presence of a minor during Mills's participation in the conspiracy, nor evidence indicating that danger to a minor was reasonably foreseeable to

him.  We therefore reverse and remand for re-sentencing Mills on this issue.  We affirm the district court on all other issues raised by defendant-appellants, and therefore affirm each appellant's conviction and Simpson's sentence.[1]

## I.  FACTS AND PROCEEDINGS

Paul Mills supplied at least eighteen (18) 150-pound tanks of anhydrous ammonia to methamphetamine cooks in the Dallas area between April 2000 and April 2001.  Twelve (12) of these tanks went

---

[1]In his brief to this Court, Simpson argued that the district court erred by applying the 2001 Sentencing Guidelines instead of the 2000 version.  At oral argument, however, Simpson's counsel expressly conceded the frivolousness of this argument.  After briefing, Simpson attempted to adopt both of Mills's briefs in their entirety.  Where, as here, the Sentencing Guidelines legal issue has underlying facts that differ between the parties, we cannot allow Simpson to adopt Mills's challenges pursuant to Fed. R. App. P. 28(i).  United States v. Solis, 299 F.3d 420, 447, n.90 (5th Cir. 2002) (finding that sentencing challenges cannot be adopted under Rule 28(i), particularly challenges to the application of the Sentencing Guidelines, because they are fact-specific"); United States v. Morrow, 177 F.3d 272, 302, n.3 (5th Cir. 1999) (same).  Even if we were to allow Simpson to adopt the legal arguments of Mills's sentencing challenge, the record clearly demonstrates that (1) Simpson was actively involved in the methamphetamine production until the end of the conspiracy, (2) he lived in Baldwin's house until that time, and (3) he helped take care of Baldwin and Quimby's infant child.  Thus, the danger to a minor was certainly foreseeable to Simpson.  Finally, during oral argument Simpson contended for the first time that we should find that the district court committed plain error in applying the six-level enhancement to Simpson, because a child's close proximity to a methamphetamine laboratory should be insufficient to trigger the enhancement provisions.  Because we generally do not consider points raised for the first time at oral argument, see United States v. Ulloa, 94 F.3d 949, 952 (5th Cir. 1996), and because of the reasons articulated infra, we decline to adopt Simpson's overly narrow interpretation of the six-level enhancement provision.  As a result, the record firmly supports application of § 2D1.1(b)(5)(C)'s six-level enhancement to Simpson's sentence.

to Jerry Baldwin, the alleged ring-leader of the methamphetamine manufacturing conspiracy. Mills personally delivered tanks of ammonia to Baldwin and helped him store it in a hidden compartment of a locked shed in the backyard of Baldwin's residence. Baldwin produced the methamphetamine in a recreational vehicle (RV) next to his house, and Mills apparently witnessed this methamphetamine production on at least one occasion.

The conspiracy ended when police and DEA agents raided Baldwin's house on May 24, 2001. Baldwin and Simpson were in the shed in the backyard starting to manufacture methamphetamine when the police executed their search warrant. A Dallas Police Department officer testified that when they conducted the raid they found Baldwin's wife, Patty Quimby, in the house, which was saturated with the smell of ammonia. With her was their infant daughter, who was less than 30 days old. Regarding a search conducted subsequent to the May 24 search, a DEA agent testified that he discovered three tanks of ammonia in the hidden compartment of the backyard shed.

Despite the presence of ammonia tanks in Baldwin's shed after May 24, the evidence makes clear that Mills's participation in the conspiracy ceased no later than April 11, 2001. A wiretap and surveillance of Baldwin's home began on or about that date, but DEA agents testified that Mills participated in none of the calls, and was not observed by the surveillance cameras during this phase of the investigation. Baldwin himself testified that he had been

3

unable to contact Mills after the beginning of April, presumably because Mills had taken an advance payment from Baldwin but had failed to deliver any ammonia thereafter.

Baldwin also testified that, in addition to his newly born daughter, he is the father of several other children, including a six-year old; and transcripts of two phone conversations substantiate this testimony.[2] There is no direct evidence, however, that the six-year old or any child other than the newborn was living in Baldwin's house, or had even visited the house, during the term of Mills's involvement in the conspiracy. Neither is there any evidence that Mills had encountered Quimby personally, that he was aware of her pregnancy, or that he knew of the birth of her and Baldwin's daughter subsequent to his last participation in the conspiracy.

## II. ANALYSIS

### A. STANDARD OF REVIEW

We review the district court's interpretation or application of the Sentencing Guidelines de novo, but review factual findings

---

[2]The government filed a motion to supplement the record shortly before oral argument in this case, which consisted of transcripts of two telephone conversations between Baldwin and Quimby. We implicitly granted this motion when we considered the content of the motion in connection with oral argument. Although the district court accepted into evidence the CDs on which these conversations were recorded, their content was never explicitly considered by the sentencing court. Moreover, we find them insufficient to show that the presence of a minor was reasonably foreseeable to Mills.

4

for clear error.[3]  "As long as a factual finding is plausible in light of the record as a whole, it is not clearly erroneous."[4]

**B.   MILLS'S SENTENCE ENHANCEMENT UNDER § 2D1.1(b)(5)(C)**

The Sentencing Guidelines (the "Guidelines") contain two related enhancement provisions that are potentially applicable to the methamphetamine offense at issue here: (1) § 2D1.1(b)(5)(B) which specifies a three-level enhancement for creating a "substantial risk of harm to (I) human life other than a life described in subdivision (C); or (II) the environment;"[5] and (2) § 2D1.1(b)(5)(C) which specifies a six-level enhancement for creating a "substantial risk of harm to the life of a minor or an incompetent."[6]  If the facts support applying both provisions, only the greater enhancement applies.

According to the Guidelines's commentary, courts "shall" consider four factors in determining whether either of these enhancements apply: (1) the quality of chemicals and substances found at the laboratory, and the manner in which they were stored; (2) the manner in which these materials were disposed, and the likelihood of release of such toxic substances into the environment; (3) the duration of the offense and extent of the

---

[3]United States v. Huerta, 182 F.3d 361, 364 (5th Cir. 1999).

[4]Id.

[5]United States Sentencing Guidelines Manual ("USSG Manual") § 2D1.1(b)(5)(B) (2002).

[6]USSG Manual § 2D1.1(b)(5)(C).

5

manufacturing operation; and (4) the location of the laboratory (whether in a residential or remote area) and the number of human lives placed at substantial risk of harm.[7]

These factors do not indicate, however, the quantity of evidence that is necessary to distinguish subsection (B) from subsection (C).  For example, the fourth factor, which is the one most relevant to our inquiry, only instructs courts to consider how many lives are at stake and whether the lab is in a residential area.  Finding that lives are endangered, however, does nothing to distinguish the three-level enhancement for causing a substantial risk to any human life from the six-level enhancement for causing a substantial risk to the life of a minor.

Presumably, to merit the greater enhancement of subsection (C), it also would be necessary to establish specifically that at least one of the lives at risk is that of a minor or an incompetent, not just lives of human beings generally.  Otherwise, if the applicability of the six-level enhancement were triggered simply by evidence of endangerment to human lives, it would potentially make superfluous the three-level enhancement, which would be applicable on the basis of the exact same evidence.  To

_____

[7]USSG Manual § 2D1.1, cmt. n. 20.  In a Rule 28j letter filed April 18, 2003, the government drew attention to a recent Sixth Circuit case analyzing § 2D1.1(b)(5)(B) and applying the factors listed above to conclude that the three-level enhancement applied. United States v. Layne, 324 F.3d 464, 468-71 (6th Cir. 2003). Layne, however, did not discuss the six-level enhancement of § 2D1.1(b)(5)(C) that we address today.

give effect to the Sentencing Commission's purpose in two different enhancement provisions for the dangers caused by methamphetamine production, we must conclude that the six-level enhancement of subsection (C) has to be based on specific evidence of a risk of harm to at least one minor or incompetent.

The Pre-Sentence Report ("PSR"), on which the district court relied in applying the enhancement, took the position that Mills participated in the conspiracy from April 2000 until its final day, May 24, 2001, and recommended § 2D1.1(b)(5)(C)'s six-level enhancement because Mills "was involved in a jointly undertaken criminal activity with Jerry Baldwin and Patricia Arlene Quimby that endangered the life of a minor," specifically "cook[ing] methamphetamine in or near their residence, endangering the lives not only of unsuspecting neighbors, but the codefendants' infant child" (emphasis added). In neither the PSR nor the transcript of the sentencing hearing is there mention of any other minor. The PSR and the district court relied entirely on the Baldwins' newborn daughter.

On appeal, the government reverses its earlier district court position, arguing for the first time that the enhancement of Mills's sentence was proper because (1) Mills's delivered anhydrous ammonia to homes in residential areas and (2) Baldwin, who received twelve of the tanks of ammonia from Mills, was the father of another minor child in addition to the infant named in the PSR. The government conceded, however, that the infant was born after

7

Mills stopped dealing with Baldwin, and that no other child was considered by the probation department in preparing Mills's PSR or by the district court in sentencing him.

Neither the government's contentions nor the PSR's factual conclusions are sufficient to prove the presence of a minor while Mill was involved. First, although Baldwin testified that he is the father of a six year old, there is no record evidence that this child was present during the period of Mills's involvement, and the available evidence strongly suggests that this child never lived at Baldwin's residence during the relevant period. Even though two telephone conversation transcripts proffered by the government after sentencing indicate that a young child of Baldwin's named Brittney was present at his house, these conversations took place well after Mills's participation in the conspiracy ended, and their substance confirms that even then Brittney was not living at Baldwin's house.[8] The PSR never mentions this child in its findings, and there is no indication that the district court was aware of or considered the presence of this child in its sentencing calculus. There is simply no clear evidence that this child was ever present during the period of Mills's involvement in the conspiracy.

---

[8]The conversations took place on May 12 and 20, 2001, at least a month after Mills's stopped delivering tanks to Baldwin's residence. The conversations also contain references strongly suggesting that Brittney did not live at the house. Patty Quimby, Baldwin's wife, stated that Brittney "don't go back until five [pm]," and "she's only here for the weekend."

Furthermore, despite the PSR's conclusional statement that Mills participated in the conspiracy until May 24, 2001, there is a surfeit of testimonial evidence that Mills's contact with Baldwin had ceased altogether weeks before the birth of Quimby and Baldwin's baby. Baldwin testified that he had been unable to contact Mills at any time during the six weeks preceding the May 24 end of the conspiracy, and law enforcement officers confirmed that Mills was not identified as a participant on either the wire taps or the surveillance camera during their entire investigation, which began on April 10, 2001. Absent any evidence to the contrary, Mill's total absence of contact with the conspiracy or the conspirators is sufficient to confirm that he had stopped delivering ammonia to Baldwin well before the birth of Baldwin's baby.

It is true that, in the context of jointly undertaken criminal activity, Baldwin and Quimby's actions in furtherance of the conspiracy could be imputed to Mills for purposes of <u>guilt</u> in the conspiracy. In contrast, for <u>sentencing</u> purposes, the Guidelines specify that base offense levels and specific offense characteristics must be determined on the basis of "all <u>reasonably foreseeable</u> acts and omissions of others in furtherance of...jointly undertaken criminal activity."[9] The commentary to this section explains further that "a defendant is accountable for the

---

[9]USSG Manual § 1B1.3(a)(1)(B)(emphasis added).

9

conduct (acts and omissions) of others that was both: (i) in furtherance of the jointly undertaken criminal activity; and (ii) reasonably foreseeable in connection with that criminal activity."[10] Thus, the acts of the co-conspirators after Mills ceased involvement in the conspiracy may not be imputed to him for sentencing purposes unless such acts were reasonably foreseeable.[11]

Because the Guidelines are careful not to attribute unforeseeable acts of co-conspirators to a defendant for sentencing purposes, this same approach must apply to the even more individualized task of sentence enhancement. If acts taken in furtherance of a conspiracy cannot be attributed to a defendant unless they are reasonably foreseeable to him, surely the discrete conditions in which such acts occur should not be attributed to the defendant unless they too were reasonably foreseeable to him.

In the instant case, not only is the record devoid of evidence of any minor's presence during the span of Mills's active

---

[10]Id. cmt. n.2.

[11]The probation officer apparently contacted the Sentencing Commission and reported that he was informed that specific offense characteristics, such as this six-level enhancement, should be applied to all participants in a conspiracy regardless of their role. On the basis of this communication, the district court applied the six-level enhancement to Mills. Such second-hand communication between a parole officer and someone on the staff of the Commission is incompetent authority and neither supports the sentencing court's decision nor binds us. Furthermore, the advice itself does not necessarily conflict with our interpretation. We only conclude that, in accordance with the Guidelines, the circumstances meriting the enhancement first must be reasonably foreseeable to a participant in a conspiracy.

10

involvement in the conspiracy, but there is also a dearth of evidence to support the conclusion that Mills could have reasonably foreseen that his participation would endanger the life of a particular minor. To survive, such an enhancement would require a showing either that Mills knew Baldwin's wife was pregnant and nearing delivery or that he could have reasonably foreseen that an infant or a child would be present in the house. But it was impossible that Mills could have foreseen that the infant would be present during his period of involvement, because Baldwin's wife had not yet had the child. Neither is there clear evidence that Baldwin's other child was living at the house during Mills's involvement, or even that she had been a visitor in the house when he made a delivery. Indeed, the telephone transcripts provided by the government only appear to establish that this older child visited the home on weekends in May 2001, after Mills's participation had ceased.

Furthermore, the government failed to adduce any evidence to indicate that Mills could have known that Baldwin's wife was pregnant and would soon bear a child. As noted, Mills merely delivered tanks of ammonia to Baldwin and helped him store the tanks in a shed in the backyard of the property. Although there is evidence that Mills witnessed the production of methamphetamine on one occasion, that took place in an RV in proximity to the house, not in it. There is no evidence that on any of these occasions Mills ever interacted with Baldwin's wife or was ever in Baldwin's

11

house.

In contrast, the substantial risk of harm that Mills was causing to human life generally was reasonably foreseeable to him. Baldwin's property to which Mills repeatedly delivered tanks of ammonia was located in a residential neighborhood, so he was endangering Baldwin's immediate neighbors. It was also reasonably foreseeable to Mills that Baldwin's use of this ammonia to manufacture methamphetamine would endanger the local environment. As a result, § 2D1.1(b)(5)(B)'s three-level enhancement would have been sustainable under these factual circumstances.

To summarize, Mills had stopped delivering ammonia to Baldwin weeks before his and Quimby's daughter was born and before any other child was shown to have been present. There is no record evidence suggesting that Mills could have reasonably foreseen the presence of children in Baldwin's house, the RV, or the shed. Because, for sentencing purposes, Mills is only responsible for those acts of Quimby and Baldwin's that were reasonably foreseeable to him, he only merits sentence enhancement if the conditions necessary for enhancement were also reasonably foreseeable. There is no suggestion in the record that Mills ever interacted with Quimby or entered Baldwin's house during his participation in the conspiracy. Consequently, it was not reasonably foreseeable to Mills that his participation could constitute a substantial risk of harm to the life of any particular, identifiable minor.

III. CONCLUSION

12

For the foregoing reasons, we reverse the sentencing court's assessment of the six-level enhancement in calculating Mills's sentence, and we vacate Mills's sentence.  We affirm all other rulings of the district court.

AFFIRMED in part; REVERSED in part; Mills's sentence VACATED; and the case REMANDED for resentencing Mills.