United States Court of Appeals
Fifth Circuit

**F I L E D**

**June 14, 2004**

Charles R. Fulbruge III
Clerk

**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

No. 03-10601

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

VERSUS

JAMES RUSSELL REASONER,

Defendant-Appellant.

Appeal from the United States District Court
For the Northern District of Texas

(4:02-CR-144-3-A)

Before DeMOSS, STEWART, and PRADO, Circuit Judges.

PER CURIAM:[*]

James Russell Reasoner pleaded guilty pursuant to a written plea agreement to distribution of a controlled substance. The pre-sentence report ("PSR") and its addenda, applying the 2002 version of the Sentencing Guidelines, determined that Reasoner had a total offense level of 35 and a criminal history category of I. This calculation included a six-level increase in Reasoner's offense level pursuant to U.S.S.G. § 2D1.1(b)(5)(C) for creating a

---

[*]Pursuant to 5TH CIR. R. 47.5, the Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

substantial risk of harm to the life of a minor during Reasoner's manufacture of methamphetamine. Reasoner appeals the enhancement and the district court's denial of his third motion for a continuance. We affirm the sentence and hold the district court did not abuse its discretion in denying Reasoner's third motion for a continuance.

## BACKGROUND

In August 2000, federal investigators received information from a confidential informant that members of the Texas Aryan Brotherhood (the "Aryan Brotherhood") were distributing firearms and methamphetamine in the Dallas-Fort Worth area. The information also identified Reasoner, who was not a member of the Aryan Brotherhood, as the Aryan Brotherhood's methamphetamine manufacturer and supplier.

To investigate this information, the authorities used the services of an undercover officer who had infiltrated the Aryan Brotherhood. This undercover officer eventually was led to Reasoner's apartment, located at 2200 Aden Road, No. 1411, in Fort Worth to purchase methamphetamine. On the way to the apartment, the undercover officer was told by a leader of the Aryan Brotherhood "that Reasoner was the best source for methamphetamine he had ever had," and that the Aryan Brotherhood "helped Reasoner start his methamphetamine lab with the needed chemicals."

On August 28, 2001, the undercover officer purchased 19.45 grams of methamphetamine from Reasoner for $1,200.00. Before

2

leaving the apartment, Reasoner told the undercover officer that he could cook more methamphetamine for him if necessary. Reasoner also said that he normally cooked four to five ounces of methamphetamine "every few days."

On August 30, 2001, the undercover officer met again at Reasoner's apartment. This time, the undercover officer purchased 25.97 grams of methamphetamine from Reasoner for $1,400.00.

On November 7, 2001, Reasoner was arrested in his apartment. On December 5, 2002, the United States filed a one-count superseding information, charging Reasoner with distribution of less than 50 grams of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C). On December 6, 2002, Reasoner filed a waiver of indictment, along with a plea agreement and a factual resume. On that same date, Reasoner pleaded guilty to the single count of the information.

The PSR held Reasoner accountable for 45.42 grams of methamphetamine, resulting in a base offense level of 24. The PSR also assessed a two-level enhancement based on the presence of a firearm during one of Reasoner's drug sales, bringing the adjusted offense level to 26. The PSR then deducted three levels based on Reasoner's acceptance of responsibility, and calculated the final offense level at 23. The PSR also contained a lengthy recitation of other charges then pending against Reasoner in various state courts, dating between 1999 and 2002. All of these charges dealt with the manufacture, distribution, or possession of drugs. Based

on these other pending cases, the PSR suggested that an upward departure might be warranted pursuant to U.S.S.G. §§ 5H1.9, 5K2.0, 5K2.21, and 1B1.4.

The United States objected to the PSR, arguing that the other pending offenses should be treated as relevant conduct rather than as a basis for a potential upward departure. In an Addendum to the PSR, the probation officer accepted the government's objection. Taking the relevant conduct into account, the Addendum held Reasoner responsible for 1,654 kilograms of methamphetamine, making his base offense level 34. The Addendum also assessed a six-level enhancement pursuant to U.S.S.G. § 2D1.1(b)(5)(C) because Reasoner's manufacturing of methamphetamine on November 7, 2001, created a substantial risk of harm to the life of a minor. This brought Reasoner's adjusted offense level to 42, and after deducting the three levels for acceptance of responsibility, fixed his total offense level at 39.

After Reasoner's plea, the district court scheduled his sentencing for March 7, 2003. On February 24, 2003, Reasoner filed a motion for continuance, reciting that he had received the Addendum to the PSR holding him responsible for relevant conduct, and that he needed "additional time to investigate and get the substances tested to determine if there is material that is included in the weight of the substance that should not be included." The district court granted the motion so that both Reasoner and the government would "have sufficient time to be

4

prepared at the sentencing hearing to fully develop their respective positions on the matters mentioned in the February 10, 2003, Addendum of the Probation Officer." Sentencing was rescheduled for April 25, 2003.

On April 23, 2003, Reasoner filed a second motion to continue the sentencing because the "laboratory substance analysis has not yet been completed." The district court granted the motion "so that the government and defendant both will have sufficient time to be prepared at the sentencing hearing." Sentencing was rescheduled for May 16, 2003.

Reasoner objected to the Addendum, lodging several complaints about the drug quantities used to calculate his offense level. He also objected to the six-level enhancement for endangering a minor alleging that "[w]ith the limited amount of dangerous material in the apartment, only the defendant could have been at a substantial risk of harm."

Responding to Reasoner's objections, a Second Addendum to the PSR substantially reduced the quantity of drugs attributed to him. This reduction took four levels off of Reasoner's base offense level, reducing it to 30. This made Reasoner's total offense level 35. Combined with a Criminal History Category of I, this fixed Reasoner's sentencing range at 168 to 210 months.

On May 14, 2002, Reasoner filed a third motion for continuance. In support of the motion, Reasoner stated the following:

5

> Defendant's attorney was notified on May 13, that an addendum to the presentence report was being prepared by the probation office that could significantly impact the defendant's sentence. Defendant's attorney will not have time to properly consult with the Defendant prior to May 16 nor will Defendant's attorney be able to properly prepare for the sentencing hearing.

The district court denied this motion.

Reasoner's sentencing hearing was held on May 16, 2003. At the start of the hearing, Reasoner's attorney complained that he had just received the Second Addendum to the PSR the day before the hearing. Reasoner's attorney acknowledged that the impact of the Second Addendum was to "[reduce] the sentencing range for [Reasoner] very significantly from the one that existed before." When pressed for a specific complaint, Reasoner's attorney responded that he had a problem with the finding concerning "96.13 net grams of a mixture containing methamphetamine."

After conferring with the probation officer, the district court determined that there was a mathematical error in the calculation of the total amount, and that the actual total should be 95.77 grams. Reasoner's attorney agreed that this amended figure was "consistent" with his calculations. Reasoner's attorney also questioned another drug calculation, alleging it was "waste water." After considering Reasoner's evidence and argument on the issue, the district court agreed with him, and reduced the amount of drugs attributed to him. As to one disputed item, the district court held that it "probably should be" reduced, but that instead of calculating the reduction, "I think the best thing to do is just

6

eliminate [those] 24.32 grams . . . ." Specifically, the district court amended the findings of the Second Addendum to the PSR as follows:

> In paragraph three on page 2 of the second addendum, I find that the number 96.13 should be reduced to 71.45, and that the number 192.26 should be reduced to 142.50. In the paragraph that is immediately below the paragraph four on that page, I find that the 384.26 should be reduced to 334.5, and that the 860.26 should be reduced to 810.5.

As the district court noted, these changes did not affect Reasoner's sentencing range. Reasoner's attorney acknowledged that the court's rulings "took care of" all his objections.

Also during the sentencing hearing the district court heard testimony addressing Reasoner's objection to the six-level increase for creating a substantial risk of harm to the life of a minor during the manufacture of methamphetamine.

Mark Thorne testified that he is a sergeant with the Fort Worth Police Department and was the first officer to approach Reasoner's apartment on November 7, 2001. The apartment was located in a complex with several hundred occupants. Sergeant Thorne described the area around the apartment as "a very crowded area." Reasoner's apartment was located at the top of a flight of stairs. Just before he went up the stairs to knock on Reasoner's door, Sergeant Thorne saw a woman he estimated to be forty years old pushing a stroller containing a baby and accompanied by a four-year-old child at the bottom of those stairs.

Sergeant Thorne went up the stairs. As he knocked on the

7

door, he could smell fumes coming from inside the apartment. When Reasoner opened the door to the apartment, the smell from inside was so strong that Sergeant Thorne started coughing. Sergeant Thorne had trouble talking to Reasoner because of the fumes. Sergeant Thorne finally managed to ask Reasoner if there was a drug lab operating in the apartment, and Reasoner admitted that there was. Sergeant Thorne ordered Reasoner to sit down near the front door while he made a check of the apartment to see if there were any other people inside. Because of the intensity of the fumes in the apartment, Sergeant Thorne tried, but failed, to hold his breath as he searched the apartment. Sergeant Thorne saw a shotgun or a long rifle inside the apartment. As he continued his search, he was concerned that if there was anyone else in the apartment who might discharge a weapon, the muzzle flash "would set this place off." In addition to causing him trouble breathing, the fumes in the apartment made Sergeant Thorne's eyes water and made him feel his "health was in extreme danger."

Dale Malugani is a Fort Worth Police Officer assigned to the DEA Task Force. He was one of the officers who processed and dismantled Reasoner's drug lab. When he first entered the apartment, the fumes inside were "very irritating." The apartment had to be ventilated by opening all of the doors and windows to let the fumes out. Even after ventilation, Officer Malugani and the other officers had to wear special protective clothing and other

gear to work inside the apartment.[1]

Based on his observations inside the apartment, Officer Malugani discovered that Reasoner was using the "red phosphorous" method to cook methamphetamine. He described the "red phosphorus" method as being "far more dangerous" than the other methods used to manufacture methamphetamine. Officer Malugani testified that Reasoner's method for manufacturing methamphetamine was "inherently dangerous," and that all such labs "were subject to possible explosions."

The government introduced photographs showing that Reasoner had tried to vent the deadly phosphene gas through a tube into a one gallon plastic container on the top shelf of a closet that contained kitty litter. Among the dangers inherent in such a make-shift ventilation system are that the phosphene can leak out or that the system can become overloaded. The court asked Officer Malugani if he had "ever heard of one of these labs exploding and catching a building on fire?" Officer Malugani responded: "Yes, sir, many. Yes, sir. They are very, very prone for explosion."

Roy Gilfour testified that he is a neighborhood patrol officer with the Fort Worth Police Department assigned to patrol the area that included the apartment where Reasoner operated his drug lab. Based on his knowledge of the area, Officer Gilfour told the court

---

[1] Officer Malugani described this protective gear as follows: "We have full suits that are chemical proof, booties, gloves, hood." He also described how the officers wore either an air tank or a respirator "to keep from breathing the air."

that the apartment where Reasoner operated his methamphetamine lab was located "10 feet away from the apartment office building." Officer Gilfour also told the court that there is a playground and swimming pool located "directly behind" the office. Based on his knowledge of the apartments, Officer Gilfour indicated that "there's a large percentage of children" in the complex.

Reasoner presented testimony from Angela Springfield, the Chief Toxicologist with the Tarrant County Medical Examiner's Office. She had reviewed police reports about Reasoner and his November 7, 2001, arrest for operating his methamphetamine lab. Springfield testified that in the "red phosphorus" method of making methamphetamine, one of three things can be used as a solvent: acetone, ether, or Coleman Fuel. She did not know which one was used here. Springfield was not able to tell what other "caustic substances" may have been in the apartment. Springfield told the court that the "main person at hazard was the cooker himself." She further opined that "unless the minor was within the apartment itself during the [cooking] process, I don't see that it is any great hazard." Springfield testified that the two primary dangers of "red phosphorus" methamphetamine cooking are the release of phosphene gas and the risk of an explosion. Springfield opined that because the amounts of the chemicals reflected in the reports were "within the limits that a homeowner would have," there was no substantial risk created by the lab. She conceded that a homeowner would not be mixing and using the chemicals the way they were used

10

here. She said that she did not see anything in the reports to indicate there was a open flame source of ignition in the apartment. Based on this, she did not see "a great potential" for an explosion "unless someone walks in with a match."

At the conclusion of the evidence, the district court overruled Reasoner's objection, stating:

> Now, on the risk of harm to the life of a minor, I don't think there's any question that operating that methamphetamine laboratory right in the middle of a large apartment complex with people, and particularly children, all around created a risk to the life of everybody in the complex because of the possibility of a fire and explosion that could set other units on fire that could spread to other units, and that the fact that poisonous gasses [] conceivably could – and more than just conceivable, there's certainly a rather strong possibility that somebody would be exposed to those gasses and in particular the children who might be going up and down that stairway, knowing how children are, even maybe playing at the top of that stairway from time to time. So that in itself is a risk of harm to the life of minors, but not as significant a risk as the risk of loss of life as a result of a fire and explosion. So I'll overrule that objection.

The district court then sentenced Reasoner to 210 months' imprisonment, three years' supervised release, and a $100 special assessment. Reasoner filed a timely notice of appeal.

## DISCUSSION

**I. Whether the district court erred in applying a six-level enhancement to Reasoner's sentence pursuant to U.S.S.G. § 2D1.1(b)(5)(C).**

On appeal, Reasoner argues that the district court erred in applying the § 2D1.1(b)(5)(C) six-level sentence enhancement to his sentence. This Court reviews the application of the Sentencing

11

Guidelines de novo, and we review the sentencing court's factual findings for clear error. United States v. Simpson, 334 F.3d 453, 455-56 (5th Cir. 2003). A factual finding is not clearly erroneous as long as it is plausible in light of the record taken as a whole. Id. at 456.

Section 2D1.1(b)(5)(C) provides that if an offense involved the manufacture of methamphetamine and created a substantial risk of harm to the life of a minor or incompetent, the offense level should be increased by six levels. Section 2D1.1(b)(5)(B) provides that if an offense involved the manufacture of methamphetamine and created a substantial risk of harm to human life (other than a minor or incompetent) or to the environment, the offense level should be increased by three levels. The guideline's commentary instructs that in determining whether the offense created a substantial risk of harm to human life or the environment, the district court shall consider the following factors: (1) the quantity of any chemicals or hazardous substances found at the laboratory and the manner in which they were stored; (2) the manner of disposal of the hazardous or toxic substances and the likelihood of their release into the environment; (3) the offense's duration and the size of the manufacturing operation; and (4) the laboratory's location (e.g., whether it is located in a residential versus a remote area) and the number of human lives enduring a substantial risk of harm. § 2D1.1(b)(5)(C), cmt. n.20(A). A "minor" is defined as a person who has not yet attained the age of

12

18. Id. at n.20(B); § 2A3.1, cmt. n.1.

Reasoner argues that under the guideline factors, there was no evidence of a substantial risk of harm to a minor.

Overall, the factors weigh in favor of the government's case. Under the first factor, according to county toxicologist Springfield, the amount of chemicals found in Reasoner's apartment was small and within the limits of what a normal household would contain, although the mixture of these toxic substances would not likely be found in a normal household; and according to her testimony, there was a risk of explosion or fire from a match or open flame. Likewise, the arresting officer had to hold his breath and the other officers wore protective clothing, indicating that immediately upon entering the apartment the fumes were very strong. There was no evidence presented concerning the method of storage. Under the second factor, Officer Magulani testified that Reasoner's method of disposal of the dangerous fumes using a container of kitty litter was unsafe due to the possibility of leaks or overload. And although Reasoner factually contested the government's evidence, there was sufficient evidence for the court to factually find that Reasoner's method of making methamphetamine was inherently dangerous and created a substantial risk of fire or explosion. Under the third factor, Reasoner presented Springfield's testimony indicating the size of the operation was small, but the government presented testimony to the contrary indicating an undercover officer had purchased methamphetamine

13

manufactured in Reasoner's apartment in late August 2001, and Reasoner had indicated he could manufacture five ounces every few days. Finally, under the fourth factor, Sergeant Thorne testified that the lab was located in a highly populated residential area, where many people, including minors, would be exposed to any harm caused by the lab.

Reasoner cites <u>Simpson</u>, the only published opinion in the Fifth Circuit addressing this provision, and argues that the government did not prove that his actions would endanger the life of a particular minor. In <u>Simpson</u>, appellant Paul Mills supplied tanks of anhydrous ammonia to methamphetamine cooks. 334 F.3d at 455. He was convicted of "conspiracy to manufacture, and possession with the intent to distribute, 500 grams or more of methamphetamine." <u>Id.</u> at 454. One of the locations to which Mills delivered the tanks was a recreational vehicle parked next to a cook's residence. <u>Id.</u> at 455. The Court found that Mills had stop delivering supplies to that cook before the child at issue was born and therefore no children were present in the cook's house during the time Mills supplied the tanks and there was no other evidence concerning the presence of children where Mill's delivered tanks. <u>Id.</u> The Court then considered the guideline factors, which apply both to subsection (C), which provides for a six-level enhancement if there is a substantial risk of harm to minors, and subsection (B), which provides for a three-level enhancement if there is a substantial risk of harm to any human life or the environment. <u>Id.</u>

14

at 456; see § 2D1.1(b)(5)(B) & (C). The Court held that to distinguish the two subsections, "the six-level enhancement of subsection (C) has to be based on specific evidence of a risk of harm to at least one minor or incompetent." Id. at 456. The Court determined that because the minor indicated by the government was not present at the cook's house during the time Mills delivered supplies to the cook, Mills could not have reasonably foreseen that there would be a substantial risk of harm to the "the life of a particular minor."[2] Id. at 456-59. However, the Court found that subsection (B) would apply to Mills because there was a reasonably foreseeable substantial risk of harm to residents of the cook's neighborhood, as well as to the environment. Id. at 459.

In the present case there is ample evidence in the record to demonstrate both that specific children (the baby in the stroller and the four-year-old child) and children in general (the "large percentage" of children who lived in the complex) were exposed to the risks created by Reasoner's methamphetamine lab. Accordingly, the holding in Simpson does not bolster Reasoner's argument. In fact, in Simpson, this Court noted the following about the general risks of a methamphetamine laboratory being operated in a residential neighborhood:

> [T]he substantial risk of harm that Mills was creating to
> human life generally was reasonably foreseeable to him.
> [The cook's] property to which Mills repeatedly delivered

---

[2]"Reasonable foreseeability" was examined by the Court only because Mills was being charged as a co-conspirator. See Simpson, 334 F.3d at 458.

15

tanks of ammonia was located in a residential neighborhood, so he was endangering [the cook's] immediate neighbors. It was also reasonably foreseeable to Mills that [the cook's] use of this ammonia to manufacture methamphetamine would endanger the local environment.

Id. at 459. All that was missing in Simpson was proof that the presence of a minor was reasonably foreseeable to Mills. Here, Reasoner operated his lab in an apartment complex with a "high percentage" of children as residents. Just as Mills in Simpson was found to be endangering the lab operator's neighbors, Reasoner was endangering the occupants of the apartment complex – which included the baby in the stroller, the four-year-old child, and the "high percentage" of children who lived near Reasoner. Simpson's missing link is present here, and its holding thus provides no reason to overturn the district court's imposition of the enhancement.

Additionally, this case is similar to the Eleventh Circuit case addressing § 2D1.1(b)(5)(C), United States v. Florence, 333 F.3d 1290 (11th Cir. 2003). Florence was involved in the manufacture of methamphetamine in one room of a hotel that contained many other rooms occupied by minors. Id. at 1292. The methamphetamine lab caught fire at 1:00 a.m., causing many of the hotel's occupants, including minors, to evacuate. Id. Florence appealed the enhancement of his sentence for the offense pursuant § 2D1.1(b)(5)(C), arguing that the district court failed to identify a particular minor who was placed in substantial risk of harm. Id. The court held that the district court did not have to

16

identify a particular minor, and that the district court's findings that minors were staying at the hotel and that the fire occurred at 1:00 a.m. when guests would likely be in their rooms justified the application of § 2D1.1(b)(5)(C) to Florence's sentence.  Id. at 1293.  The court further determined that even though a particular minor need not be specified, the district court still must make a finding that a minor was placed at risk by the defendant's actions. Id.

Unlike Simpson, Florence is factually similar to Reasoner's situation because it involved danger to unnamed but yet specific minors in neighboring hotel rooms, just as Reasoner's lab involved danger to unnamed but specific minors in the stairway and in nearby apartments.  See id. at 1292.  However, Florence is distinguishable because a fire that caused the evacuation of many minors actually occurred in Florence.  See id.  In Reasoner's case, there was no fire; but based on the evidence presented, it was not clear error for the district court to find that the danger of fire or explosion existed.

Accordingly, the district court did not err in enhancing Reasoner's sentence under Section 2D1.1(b)(5)(C) because Reasoner's offense involved the manufacture of methamphetamine and created a substantial specific risk of harm to the life of the baby in the stroller and the child at the stairway near his apartment, and a general risk of harm to the minor children in the apartment complex.  Therefore, the sentence is affirmed.

17

## II. Whether the district court abused its discretion in denying Reasoner's motion for continuance.

Reasoner also argues that the district court erred in denying his third unopposed motion to continue sentencing. Reasoner argues that he lacked time to prepare and present evidence concerning the need to retest the items containing methamphetamine that were listed on the Second Addendum to the PSR.

Review of the denial of a motion for a continuance is for an abuse of discretion that results in serious prejudice. United States v. Pollani, 146 F.3d 269, 272 (5th Cir. 1998).

Reasoner's sentence was reduced in the Second Addendum to the PSR because the items found in Reasoner's lab were tested for the amount of methamphetamine contained in each, and the actual amount found in some of the items was lower than that listed in the original PSR. At sentencing, Reasoner argued that he wished to have the items retested to determine if the drug amounts should be further reduced. In response to Reasoner's objections to the second addendum at sentencing, the court reduced one amount of methamphetamine due to a mathematical error and eliminated another amount of methamphetamine due to the possible inclusion of wastewater.

Reasoner asserts that he cannot demonstrate how he was harmed by the denial of his motion to continue because all of the items were not retested as he requested. He offers no proof that the lab test was incorrect, other than the fact that his sentence was

18

reduced in the Second Addendum to the PSR due to erroneous amounts of methamphetamine. Reasoner has not offered any evidence demonstrating which items should be retested or how he would benefit at all from retesting. Therefore, he has not shown that serious prejudice resulted from the district court's denial of his motion to continue. Accordingly, the district court did not abuse its discretion in denying the motion.

## CONCLUSION

Having carefully reviewed the record of this case and the parties' respective briefing, for the reasons set forth above, we affirm Reasoner's sentence and hold that the district court did not abuse its discretion in denying Reasoner's third motion for continuance.

**AFFIRMED.**