United States Court of Appeals
Fifth Circuit

**F I L E D**

**March 1, 2005**

Charles R. Fulbruge III
Clerk

REVISED MARCH 15, 2005

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 03-30395

_____

KEVIN PAUL CAVALIER, on behalf of
Hunter Paul Cavalier; JULIE ANN CAVALIER,
on behalf of Hunter Paul Cavalier,

                                        Plaintiffs-Appellants,


        versus


CADDO PARISH SCHOOL BOARD;
PHILLIP R. GUIN; WILLIE D. BURTON;
GINGER ARMSTRONG; EURSLA D. HARDY;
ALVIN MIMS; MARK MILAM; MICHAEL J.
THIBODEAUX; WANDA J. WRIGHT;
JERRY TIM BROOKS; MILES HITCHCOCK;
MILDRED B. PUGH; and MIKE POWELL,

                                        Defendants-Appellees.


_____

Appeal from the United States District Court
for the Western District of Louisiana
_____

Before GARWOOD, WIENER and DeMOSS, Circuit Judges.

GARWOOD, Circuit Judge:

        Plaintiffs-appellants Kevin Paul Cavalier and Julie Ann

Cavalier (the Cavaliers), on behalf of their minor son, Hunter

Cavalier, appeal the summary judgment dismissal of their lawsuit against defendant-appellee Caddo Parish School Board (School Board) complaining that the School Board illegally discriminated against Hunter Cavalier on the basis of his race when he was denied admission to Caddo Middle Magnet School.[1]  We reverse and remand.

## Facts and Proceedings Below

In 2002, Hunter Cavalier (Hunter), who is white, applied for admission to the sixth grade at Caddo Middle Magnet School (CMMS), an academic and performing arts magnet school covering grades six, seven and eight, for the 2002–2003 school year.  His application was denied because his achievement test score was not high enough for a white student applicant, although it was high enough for a black student applicant.  The Cavaliers claim that but for a race-conscious admission policy, Hunter would have been admitted to CMMS.  The School Board has not denied this.

The School Board has admitted that its admission policy for CMMS does employ racial classifications in order to meet a particular racial balance at CMMS.  The procedure for admission to CMMS is contained in School Board Policy JECC.  To qualify for admission to CMMS, an applicant must: 1) have high motivation toward excellence, as evidenced by consistent achievement and acceptable behavior; 2) be performing on grade level or better; 3) have a grade point average (GPA) of 2.0 or better in reading and

---

[1]On this appeal, as throughout the proceedings in the district court, the Cavaliers proceed *pro se*.

math and 2.5 or better overall; and 4) have 95% or better attendance. In addition, the student must take a standardized achievement test, the California Achievement Test (CAT), for ranking purposes.[2]

After the initial qualifications are taken into account, the number of qualified applicants usually far exceeds the number of available openings. To determine which students will be offered admission, CMMS gives priority to qualified siblings of students who also attend CMMS and to black students who would otherwise attend a school with over 90% black student enrollment. CMMS then ranks the remaining qualified applicants based on their CAT test score. Regarding these latter rankings, the policy states that CMMS "will maintain a list of rankings for black students and a list of rankings for white students." The vacancies are then filled so that CMMS will have a racial mix of 50% white and 50% black, plus or minus 15 percentage points.[3] CMMS accepts qualified applicants of any race subject to the number of openings available by race, according to the required racial mix, and no applicant of any race who does not meet the initial admission requirements is accepted.

---

[2] The policy also has two nonacademic requirements: the students must have parental permission and support and be in good health or under a doctor's care.

[3] In 2001, the Board approved Item No. 37, which required CMMS enrollment to be within the parameters of a consent decree entered in 1981, discussed *infra.* The consent decree gave a projected racial enrollment for CMMS of 50% black/white, plus or minus 15 percentage points.

Hunter met the initial admission requirements for entrance into CMMS for the 2002–2003 school year. However, based on his CAT test score, and due to the number of slots available for white students, he was not admitted.

For the 2002–2003 school year at CMMS, the lowest CAT test score for a nonsibling white applicant given admission to the sixth grade was 142; the lowest CAT test score for a nonsibling black applicant given admission was 117. Hunter's CAT test score was 140. There were seven nonsibling white applicants not selected for admission who had scores of 141 and six, including Hunter, who had scores of 140. Sixty-seven black students who scored less than Hunter (140) on their CAT test were admitted to the sixth grade.

The 2002–2003 sixth grade CMMS class consisted of 449 students. Fifty-one siblings were admitted, of whom 42 were white and 9 were black. Another 398 nonsibling students were admitted on the basis of their CAT test score ranking, of whom 259 were white and 139 were black. While the incoming sixth grade class was 67% white and 33% black, the total student composition of CMMS for the 2002–2003 school year was 65% white and 35% black, a result barely within the School Board-required racial mix for CMMS of 50% black/white, plus or minus 15 percentage points.[4]

---

[4] Based on our review of data obtained by the Cavaliers from the School Board and submitted in conjunction with a motion for preliminary injunction, it appears that if the School Board did not use separate test-ranking lists for white and black applicants, the score that would have resulted in a sixth grade class at CMMS for the 2002–2003 school year of roughly the same size as the actual class would have been 130. Using a score of 130, the sixth grade class apparently would have been approximately 25% black and 75% white.

The Cavaliers, on behalf of Hunter, filed suit against the School Board, and twelve of its members, alleging that Hunter was discriminated against on the basis of his race when he was denied admission to CMMS. The Cavaliers sought declaratory and injunctive, compensatory damages, and attorneys' fees and costs, under the Fourteenth Amendment and 42 U.S.C. §§ 1981, 1983, and 2000d. The parties consented to the exercise of jurisdiction by a magistrate judge, and the district court referred the case to a magistrate judge. The School Board filed a motion to dismiss or for summary judgment on the ground that the admission procedure for CMMS is pursuant to a court-ordered consent decree and, therefore, is constitutional. The magistrate judge granted the defendants' motion, dismissing all claims against all parties.[5] The Cavaliers subsequently filed a timely motion for reconsideration, which the magistrate judge denied. The Cavaliers then timely appealed.

## Discussion

The Board attempts to justify its admission policy based on a consent decree entered in 1981 involving the Board. Because this consent decree no longer applies to CMMS, it cannot justify the Board's policy, and because the Board shows no other compelling governmental interest for its racial classification, we hold that

---

[5] The magistrate judge previously had dismissed the Cavaliers' claim for compensatory damages against the individual members of the School Board based on qualified immunity. The Cavaliers have not appealed that ruling.

5

the policy is unconstitutional. Furthermore, even if CMMS were still subject to the decree, because the Board has not shown that it has considered any race-neutral means to achieve its desired racial mix and relies exclusively on a racial quota, the policy is not narrowly tailored. Therefore, we reverse and remand.[6]

## I. Standard of Review

We review *de novo* the magistrate judge's grant of summary judgment.[7] *Austin v. Will-Burt Co.*, 361 F.3d 862, 866 (5th Cir. 2004). Summary judgment is proper only if, viewing the evidence in

---

[6] On July 29, 2004, some two months subsequent to oral argument herein, the School Board filed with this court a motion to dismiss the appeal as moot. The School Board attached to its motion an affidavit from its counsel in which she stated that: on May 19, 2004, she mailed a letter to the Cavaliers advising them that there were openings for the eighth grade at CMMS for the 2004–2005 school year; if Hunter met the general requirements for admission, he would be admitted to the eighth grade at CMMS upon the submission of an application, included with the letter to the Cavaliers; and no further testing would be needed for admission. The School Board claims that this offer of admission to Hunter renders the appeal moot.
We disagree. In their complaint, the Cavaliers sought, among other things, compensatory damages. In their opposition to the School Board's motion to dismiss the appeal, the Cavaliers have alleged damages due to the School Board's policy. The Cavaliers brought their suit in 2002 after Hunter was denied admission to CMMS for the 2002–2003 school year, his sixth grade year. The Cavaliers allege that because of the denial of Hunter's admission to CMMS, in order to provide the best alternative to CMMS, they enrolled him in a private school for two years, his sixth and seventh grade years, at a cost that was presumably higher than what they would have had to pay if Hunter had attended CMMS. The private school was also allegedly further from their residence than CMMS, resulting in additional transportation costs. The Cavaliers have sought, among other things, compensatory damages and have alleged damages due to the School Board's policy. Past damages that are in no way addressed by the offer of admission to Hunter for his eighth grade year. We accordingly deny the motion to dismiss the appeal as moot.

[7] Although the Board filed a motion to dismiss or for summary judgment, because the magistrate judge considered materials outside of the pleadings, we treat the motion as a motion for summary judgment. *See Meister v. Tex. Adjutant General's Dept.*, 233 F.3d 332, 335 (5th Cir. 2000).

the light most favorable to the nonmoving party, the record establishes "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c).

## II. Constitutionality of the Admission Policy

### A. Strict Scrutiny Review

We apply strict scrutiny review to the School Board's race-conscious admission policy: "It is by now well established that '*all racial classifications* reviewable under the Equal Protection Clause must be strictly scrutinized.'" *Gratz v. Bollinger*, 123 S.Ct. 2411, 2427 (2003) (quoting *Adarand Constructors, Inc. v. Peña*, 115 S.Ct. 2097, 2111 (1995)) (emphasis added). To pass strict scrutiny review, the School Board must demonstrate that the "use of race in its current admission program employs '*narrowly tailored measures* that further *compelling governmental interests*.'" *Gratz*, 123 S.Ct. at 2427 (quoting *Adarand*, 115 S.Ct. at 2113) (emphasis added).

### B. Compelling Governmental Interest

#### 1. Remedying Current Effects of Past Segregation

Because the School Board previously operated a dual school system, in violation of the Fourteenth Amendment, it bears the "primary responsibility to 'eliminate from the public schools all vestiges of state-imposed segregation.'" *Davis v. East Baton Rouge Parish Sch. Bd.*, 721 F.2d 1425, 1434, 1436 (5th Cir. 1983) (quoting

7

*Milliken v. Bradley*, 97 S.Ct. 2749, 2762 (1977)).  Remedying the present effects of past discrimination is a compelling interest that in particular circumstances may justify appropriate use of certain racial classifications.  *Dallas Fire Fighters Ass'n v. City of Dallas, Tex.*, 150 F.3d 438, 441 (5th Cir. 1998).

In justifying its admission policy, the School Board has relied exclusively on a consent decree entered by the Western District of Louisiana in 1981 directing the desegregation of the Caddo Parish school system (the 1981 Consent Decree).  The School Board has not identified any current effect or condition at CMMS that is traceable to the past segregation within the school system.[8]  Therefore, whether the School Board's use of racial classifications serves a compelling governmental interest by seeking to remedy the current effects of past segregation depends entirely on whether the 1981 Consent Decree obligates the School Board to use racial classifications in its current admission policy.  As we conclude that the 1981 Consent Decree is no longer applicable to CMMS, it cannot justify the School Board's race-conscious admission policy.

### a.    Background of the 1981 Consent Decree

---

[8] In their interrogatories, the Cavaliers asked that the School Board describe all evidence of present effects of past racial discrimination that could justify the use of racial classifications in its admission process.  The School Board responded that the reason for the use of the racial classifications was "to comply with the [1981] Consent Decree."  The School Board then stated that "[t]here has not been any attempt to determine if other reasons exist which could justify the use of racial classifications."

8

The 1981 Consent Decree has it roots in litigation that began in 1965 and that has been the subject of multiple cases within this circuit. The following historical background comes from two earlier cases involving the 1981 Consent Decree: *Jones v. Caddo Parish School Board*, 735 F.2d 923, 924–26, (5th Cir. 1981) (*Jones I*), and *Jones v. Caddo Parish School Board*, 204 F.R.D. 97, 98–100 (W.D. La. 2001) (*Jones II*):

In 1965, the parents of seven black children commenced a suit against the School Board seeking desegregation of the Caddo Parish public schools. The United States later intervened as a plaintiff. In 1973, the district court ordered the School Board to implement a desegregation plan; a plan was developed and took effect. In 1976, the School Board filed a motion to have the school system declared unitary, which would have warranted the dismissal of the original suit; however, the United States opposed the motion. In 1977, the district court: (1) ruled that the School Board had fully complied with the 1973 court-ordered desegregation plan; (2) declared the school system to be unitary; and (3) dismissed the suit against the School Board. Thereafter, the United States filed a motion to amend the judgment, the filing of which suspended the finality of the judgment pending decision on the motion. In 1980, the district court gave notice that unless the plaintiffs' attorneys objected, the United States, as plaintiff-intervenor, would represent the interests of the private plaintiffs; the

9

district court did not receive any objections. The United States and the School Board then entered into negotiations, which resulted in the district court-ordered 1981 Consent Decree.

### b. 1981 Consent Decree

In the 1981 Consent Decree, the district court determined that "the plan for the System embodied in this Decree is reasonable and appropriate for the additional desegregation of the System, and upon its successful implementation will in fact and in law create a unitary school system for Caddo Parish."

The decree, among other things, called for the establishment of magnet schools:

> "The Board will establish new magnet schools at three elementary schools . . . and at one middle school (Eden Gardens Junior High School) in order to enhance the quality of education and bring about a greater degree of desegregation at those schools. . . . The Board will establish an aggressive magnet recruitment program and will permit and encourage students to attend magnet schools using every reasonable effort to achieve the projected racial enrollment for each school within the time period permitted under this Decree."

The decree also detailed the projected racial enrollment for each magnet school and how the projection was to be achieved: "It is understood by the parties that magnet programs at particular schools may be revised in order to effectively provide for the recruitment and retention of students in the magnet schools and to achieve and maintain a desegregated enrollment." The projected racial enrollment for CMMS—formerly Eden Gardens Junior High School, located in a predominantly black neighborhood with a

10

predominantly black student body—was 50% white and 50% black. "[E]nrollment at each magnet school" was to "be on a parish wide basis" and students were to be assigned to the magnet schools based on the following priorities, which were the only priorities stated in the decree: 1) qualified siblings of students who attend the magnet school; 2) qualified black students who would otherwise attend a school with over 90% black student enrollment; and 3) qualified white students who would otherwise attend a school with over 65% white student enrollment. These priorities were to apply, however, only to the extent that they did not impede the School Board's achievement of the projected racial enrollments at the magnet schools.

The School Board was to implement the magnet school program at Eden Gardens Junior High, which would become CMMS, before or beginning with the 1982–83 school year. The School Board was to "use its best efforts to attain the projected racial enrollments . . . by the end of the 1984–85 school year by developing attractive programs at [CMMS] and by encouraging students of both races to attend [CMMS] and benefit from [its] programs."

The school system was to remain under the jurisdiction of the district court during the period in which the decree was in effect, subject to certain provisions that provided for the termination of the court's jurisdiction. The decree specifically provided for the

termination of the district court's jurisdiction over the magnet and laboratory[9] schools:

> "With respect to the magnet school and laboratory school proposals contained in . . . this Decree, the Board shall have three years from the respective implementation dates for each such school within which to meet the projected enrollments at the magnet and laboratory schools. Such projected enrollments for a particular school shall be deemed to have been met if the actual enrollment in the school is within ± 15 percentage points of the projection for such school . . . . Upon meeting the projected enrollments for all magnet and laboratory schools covered by this Section D of Part V, this Decree shall terminate as to such schools, the Board shall be entitled to an order of the Court so stating, and the United States shall not be entitled to seek any further or additional remedy with respect to such schools."

Finally, the decree outlined the procedure by which the School Board could seek an order declaring the school system to be unitary and dismissing the case:

> "At any time after the 1983-84 school year, the Board may file a Notice of Compliance with the terms and conditions of this Decree. If the United States agrees that the Board is in full compliance with the terms and conditions of this Decree, the United States shall join in the Notice and shall state that it supports an order declaring the System to be unitary and dismissing the case. If no objection to the Notice is made within 30 days of its filing, the Court shall enter an order declaring the entire system unitary, to the extent it has not already been so declared, and terminating this case. Any objections must be specific as to alleged terms of noncompliance with the provisions of this Decree. The objections shall be heard by the Court under reasonable procedures set forth by the Court and in the event any further remedy is ordered, it shall be limited to resolving the objection so filed."

---

[9] The decree directed the School Board to establish a laboratory school program that would be operated in conjunction with area universities and colleges.

### c.   *1990 Order*

In 1987, the School Board filed a Notice of Compliance with the 1981 Consent Decree and requested the district court to rule that the school system had achieved unitary status. On April 4, 1990, based on a joint motion filed by United States and the School Board, the district court entered an order affirming the parties' agreement (the 1990 Order).  *Jones II*, 204 F.R.D. at 98–99.  The 1990 Order provided in pertinent part:

> "(1) Except as specifically set forth in § 7 of the Joint Motion, there are no issues or disputes regarding successful compliance and full implementation of the 1981 Consent Decree;
>
> * * *
>
> (3)  The [] Board has within the appropriate parameters met the projected enrollments for all magnet and laboratory schools covered by Part V, Sections D[, termination of jurisdiction over magnet and laboratory schools,] . . .;
>
> (4)  In accordance with Part V, Sections A-E of the Consent Decree:
>
> > (i)  The Consent Decree is terminated . . . as to magnet schools and laboratory schools covered by Sections D and E, Part V of the Decree, and the United States shall not be entitled to seek any further or additional remedy with respect to any of said magnet schools, laboratory schools, schools north of Caddo Lake, nor with respect to any Mandatory Assignment District [in the decree] . . . ."

With the entry of the 1990 Order, none of the remaining "issues or disputes regarding successful compliance and full implementation of the 1981 Consent Decree" involved CMMS, mandatory student assignments, or projected racial enrollments.  The portions of the 1981 decree that the United States insisted, in section 7 of

13

the 1990 Joint Motion, had not been fully implemented as required were the following: assignment of principals to schools (under Part I, Section F, entitled "Faculty and Staff"); establishment of enhancement programs at remaining one-race schools (under Part II, Section E, entitled "Remaining One-Race Schools," relating to programs at such schools); and Majority to Minority Transfers (under Part II, Section F, relating to allowing and encouraging, in reference to one-race schools, transfers of students from a school in which the student is in the racial majority to a school in which the student would be in the minority). *See Jones II*, 204 F.R.D. at 99 n.1.

### d.    Status of the 1981 Consent Decree

Based on the 1990 Order, the 1981 Consent Decree is no longer applicable to CMMS and cannot form the justification for the use of racial classifications in CMMS's admission policy. The Consent Decree clearly contemplated that it could be terminated with respect to the magnet schools:

> "*Upon meeting the projected enrollments for all magnet and laboratory schools . . ., this Decree shall terminate as to such schools*, the Board shall be *entitled* to an order of the Court so stating, and the United States shall not be entitled to seek any further or additional remedy with respect to such schools." (emphasis added).

Under the Consent Decree, the School Board had the obligation to use "every reasonable effort" and "its best efforts" to "achieve" or "attain" the projected racial enrollments for CMMS by the end of the 1984–85 school year, and upon meeting the projected

14

enrollments, the Consent Decree was to terminate as to CMMS. The Consent Decree, however, did *not* give the School Board an indefinite obligation to *maintain* the projected racial enrollment for CMMS once the decree was terminated as to CMMS.

Consistent with the provisions of the 1981 Consent Decree, the 1990 Order unambiguously released the magnet schools, including CMMS, from any further obligations of or under the Consent Decree: "The [] Board has within the appropriate parameters *met the projected enrollments for all magnet and laboratory schools*";[10] "The *Consent Decree is terminated . . . as to the magnet schools. . .*, and the United States *shall not be entitled to seek any further or additional remedy* with respect to any of said magnet schools . . . ." Therefore, with respect to the 1981 Consent Decree, upon which the School Board justifies its racial classification, there is nothing left regarding CMMS.

Moreover, the law is clear that the School Board's obligation under the Consent Decree may be reduced or eliminated in some respects even if the entire school system is not totally in compliance with the Consent Decree or has not been declared unitary. In *Green v. School Board of New Kent County*, 88 S.Ct. 1689 (1968), the Supreme Court "identified various parts of the

_____

[10] CMMS opened for the 1982–1983 school year and met its projected racial enrollment level of at least 35% black students during its first year and three out of the first four years. The black student enrollment for the first four years was: 37.3% (1982–1983), 36.1% (1983–1984), 34.4% (1984–1985), 38.8% (1985–1986).

15

school system which, in addition to student attendance patterns, must be free from racial discrimination before the mandate of [*Brown v. Board of Education*, 74 S.Ct. 686 (1954),] is met: faculty, staff, transportation, extracurricular activities, and facilities." *Freeman v. Pitts*, 112 S.Ct. 1430, 1443 (1992) (citing *Green*, 88 S.Ct. at 1692). In *Freeman*, the Supreme Court held that a "district court need not retain active control over every aspect of school administration until a school district has demonstrated unitary status in all facets of its system." *Freeman*, 112 S.Ct. at 1436.

> "We hold that, in the course of supervising desegregation plans, federal courts have the authority to relinquish supervision and control of school districts in incremental stages, before full compliance has been achieved in every area of school operations. While retaining jurisdiction over the case, the court may determine that it will not order further remedies in areas where the school district is in compliance with the decree. That is to say, upon a finding that a school system subject to a court-supervised desegregation plan is in compliance in some but not all areas, the court in appropriate cases may return control to the school system in those areas where compliance has been achieved, limiting further judicial supervision to operations that are not yet in full compliance with the court decree. In particular, the district court may determine that it will not order further remedies in the area of student assignments where racial imbalance is not traceable, in a proximate way, to constitutional violations." *Id*. at 1445–46.

The Supreme Court did recognize that "[t]wo or more *Green* factors may be intertwined . . . in their relation, so that a constitutional violation in one area cannot be eliminated unless the judicial remedy addresses other matters as well" and that,

16

"[a]s a consequence, a continuing violation in one area may need to be addressed by remedies in another." *Id.* at 1449. Nevertheless, the record must demonstrate why a continuing remedy in one area in which the school system was compliant was needed to remedy the remaining defects:

> "There was no showing that racial balancing was an appropriate mechanism to cure other deficiencies . . . . It is true that the school district was not in compliance with respect to faculty assignments, but the record does not show that student reassignments would be a feasible or practicable way to remedy this defect." *Id.*

A case from the First Circuit, *Wessmann v. Gittens*, 160 F.3d 790 (1st Cir. 1998), illustrates the application of *Freeman* in a situation very similar to the present case. In a background case to *Wessmann*, a district court in 1974 found "the school system as a whole guilty of *de jure* segregation" and concluded that three schools operated by the City of Boston, including Boston Latin School (BLS), "were complicit in promoting and maintaining a dual school system." *Id.* at 791-92. The district court, among other things, required BLS to ensure that at least 35% of each entering class would be made up of black and Hispanic students. By 1987, the three schools had, "for all practical purposes," achieved unitary status in the area of student assignments; however, "comparable improvement had not been accomplished in other areas, such as faculty and staff integration and the renovation of facilities." *Id.* at 792. Because of the lack of progress in these

17

other areas, in 1987 the First Circuit "instructed that federal court supervision of elements other than student assignment continue." *Id.* The district court then relinquished control over student assignments, freeing the schools from the requirement to maintain the 35% set-aside, but retained active supervision over other aspects of the school system. *Id.*

Similar to the background situation described in *Wessmann*, in 1990 the district court relinquished judicial supervision over projected racial enrollments at all magnet schools within the Caddo Parish school system by *terminating the decree* with respect to the magnet schools, as allowed by *Freeman* and by the terms of the 1981 Consent Decree. While the 1990 Order did not wholly terminate the entire Consent Decree, none of the remaining issues regarding its successful compliance and full implementation involved CMMS. In fact, none of the remaining issues—faculty and staff assignments, enhancing of remaining one-race schools, and majority to minority transfers—related to meeting projected racial enrollments or mandatory student assignments *at any school* in the system. According to the 1990 Order, the School Board had complied with all student assignment and projected enrollment provisions of the Consent Decree. Furthermore, we see nothing in the School Board's summary judgment evidence to suggest that continued student racial balancing at CMMS is a "feasible or practicable way" to remedy the remaining deficiencies identified in the 1990 Order. In any event,

18

the Consent Decree stated that the magnet schools were to be established at particular schools "in order to enhance the quality of education and bring about a greater degree of desegregation at *those* schools," (emphasis added), not at all schools within the district.[11]

Therefore, based on the 1990 Order, the 1981 Consent Decree is no longer applicable to CMMS and cannot be used in any sense to justify the racial quotas and balancing contained in the CMMS admission policy. As the 1981 Consent Decree has not been applicable to CMMS since 1990, the School Board cannot rely on the Consent Decree to establish a finding of current effects of past discrimination. In order to support its actions, the School Board "must make specific findings, independent of the Decree," and as there are no such findings before us in the record, "we cannot hold

---

[11] The School Board argues that until the school system is declared unitary in whole or in part, the School Board is obligated by law to comply with the provisions of the Consent Decree. This is, in essence, a collateral attack on the 1990 Order. Morever, the Board's argument fails to recognize the holding in *Freeman*:

> "To say . . . that a school district must meet all six *Green* factors before the trial court can declare the system unitary and relinquish its control over school attendance zones, and to hold further that racial balancing by all necessary means is required in the interim, is simply to vindicate a legal phrase. The law is not so formalistic." *Freeman*, 112 S.Ct. at 1448–49.

Similarly, in finding that the admission policy was justified because of the 1981 Consent Decree, the magistrate judge stated that the 1990 Order "did not declare expressly that the district was unitary in student attendance patterns." Nevertheless, even though the 1990 Order did not use the magic word "unitary" with respect to the magnet schools, that was its effect. The 1990 Order expressly "terminated" the 1981 consent decree "as to" the "magnet schools" and declared that all provisions concerning the magnet schools, and concerning all student assignments and projected racial enrollments, had been fulfilled and that the United States was not entitled to seek further remedies with respect to the magnet schools or any mandatory student assignment provision in the decree. The 1990 Order did not need to specifically say "unitary" to effectively declare that the magnet schools were outside of the 1981 Consent Decree.

19

that [the School Board's actions] were in furtherance of a compelling state purpose." *Police Ass'n of New Orleans Through Cannatella v. City of New Orleans*, 100 F.3d 1159, 1169 (5th Cir. 1996).

*Wessmann* also illustrates that the School Board cannot rely on the 1981 Consent Decree to support its contention that it is remedying prior segregation. In *Wessman*, after the schools discontinued the use of the 35% racial set-aside, they subsequently adopted a policy that allocated half of the seats of each new class using "flexible racial/ethnic guidelines." *Wessmann*, 160 F.3d at 793. Thereafter, a white student who would have been admitted to BLS but for the policy that accounted for race, brought suit against the school committee. The district court upheld the policy in part because it supposedly was aimed at remedying the vestiges of past discrimination. *Id.* at 793-94. However, on appeal the First Circuit reversed and struck down the policy, rejecting the explanation that the policy redressed the vestiges of past discrimination. The school committee was not able to satisfy its burden of showing a "strong basis in evidence" that the policy remedied past segregation, *id.* at 800, in spite of the fact that the schools had previously been found guilty of maintaining a dual school system and had been required to specifically reserve at least 35% of BLS seats to certain minorities.

20

The School Board relies on the unpublished opinion *Bryant v. Caddo Parish School Board*, CV No. 95-0441 (W.D. La. Jan. 3, 1997). In *Bryant*, which likewise involved a white student's challenge to the CMMS admissions criteria, the plaintiffs argued that the 1981 Consent Decree was no longer applicable because of the 1990 Order.[12] The district court rejected the argument, relying on the fact that the plaintiff had not established that the *entire* Consent Decree had been complied with and on the fact that the entire school system had not been declared unitary:

> "Bryant fails to mention, however, that this Court did not hold that Part I, Section F-Faculty and Staff; Part II, Section E-Remaining One-Race Schools; and Part II, Section F-Majority to Minority Transfers- of the Consent Order had been fully implemented and complied with. Furthermore, Bryant has failed to produce any evidence demonstrating that the Caddo Parish School system has

---

[12] Both the policy in *Bryant* and in the present case have the same criteria to determine qualified applicants and to rank those qualified applicants. The policy in the present case mandates the use of two ranking lists-one for white students and one for black students, and while there is no indication in *Bryant* that the policy involved there mandated two separate ranking lists, we nevertheless assume that it most likely did: Policy JECC indicates that it was adopted February 2, 1983, and amended January 16, 1985, without any indication that its content was any different when Bryant applied to CMMS in 1994 than it was when Hunter applied in 2002. Also, at oral argument, the School Board claimed that policy in *Bryant* is the same policy before us now. If there is any difference between the two cases, it may be with respect to the projected racial enrollment requirement—here the racial mix is a requirement, whereas in *Bryant* it was merely a goal. In the present case, the Board is governed by Item No. 37—adopted after *Bryant*—requiring CMMS to be within the racial parameters of the 1981 Consent Decree (50/50, ±15 percentage points). In *Bryant*, however, the racial enrollment goal of 50/50, ±15 percentage points appears to be only a *goal*. Nevertheless, regardless of Item No. 37, Policy JECC, the policy presumably in effect at the time of *Bryant*, provides that "vacancies *will* be filled from the rankings in accord with the projected racial enrollments called for in the Consent Decree." While Item No. 37 appears to make the 1981 Consent Decree racial enrollment projections a firm requirement for the School Board, it appears that even at the time of *Bryant*, the admission policy sought to fill vacancies according to the same projections. Therefore, the policy in *Bryant* appears to be substantially the same as the policy in the present case.

21

fully implemented and complied with the remaining sections of the Consent Decree. Thus, the Caddo Parish public school system has not been declared unitary and the Consent Decree still applies to the Caddo Parish Schools which, of course, includes [CMMS]." *Id.*

On appeal, this court summarily affirmed the district court, *stating only:*

> "We have carefully reviewed the briefs, the records excerpts and relevant portions of the record itself. For the reasons stated by the district court in its memorandum ruling and Order filed under date of January 3, 1997, we are satisfied that the Summary Judgment granted by the district court in favor of Caddo Parish School Board should be and is now AFFIRMED." *Bryant v. Caddo Parish School Board*, No. 97-30135 (5th Cir. September 26, 1997) (per curiam; unpublished).

We are not bound by our affirmance of the district court in *Bryant*. The opinion is not precedential, as it is an unpublished opinion issued pursuant to Fifth Circuit Rule 47.5 after January 1, 1996. Under Rule 47.5.4, the opinion is binding only under the doctrines of *res judicata*, collateral estoppel, or law of the case, none of which apply here.

While an unpublished opinion may be persuasive under Rule 47.5.4, we are not persuaded by the *Bryant* affirmance or by the underlying district court opinion. We based our affirmance on the "reasons stated by the district court in its memorandum ruling," without providing any independent analysis. The district court's one-paragraph discussion of the 1981 Consent Decree in light of the 1990 Order did not address several key points of the analysis: 1) the Supreme Court's decision in *Freeman* that allows a school

22

district to be declared unitary in an incremental fashion; 2) the Consent Decree itself contemplated that the magnet schools would be released from the decree when their related obligations were implemented; 3) the purpose of the magnet schools was to "enhance the quality of education and bring about a greater degree of desegregation *at [the schools that were to become the magnet]* schools," (emphasis added); and 4) there is no clear relationship between the remaining deficiencies outlined in the 1990 Order, none of which dealt with racial enrollment projections, and racial balancing at CMMS. Therefore, the *Bryant* case does not influence our reasoning with respect to the 1990 Order and its effect on the 1981 Consent Decree.[13]

The School Board also points to, and the magistrate judge relied on, *Davis v. East Baton Rouge Parish School Board*, 721 F.2d 1425 (5th Cir. 1983), in which this court upheld an admission policy similar to that used by the School Board here. In *Davis*, the school board operated under a court-approved admission policy according to which the board selected applicants to its magnet schools using two lists, one for white students and one for black

---

[13] Concerning the 1990 Order and its effect on the 1981 Consent Decree, in 2001 the district court in *Jones II* commented that the parties seeking to intervene at that time were seeking to do so "twenty years after the district court entered the 1981 Consent Decree, *and 11 years after the court granted unitary status to the school district*." *Jones II*, 204 F.R.D. at 100 (emphasis added). The district court then stated that the "only issue remaining before this court is continued compliance with the parameters of the 1990 order." *Id.* While this is not determinative, it does indicate that one previous district judge thought, as we hold now, that the 1990 Order did reduce the scope of the 1981 Consent Decree.

students. The board was to fill seats from the separate lists to achieve a racial balance at each magnet school of 60% white students and 40% black students. If by April 1 of each year the seats at a magnet school reserved for a particular race had not been filled, those seats could be opened to students of any other race. The district court, however, later modified the admission policy directing that white students could not be admitted in any proportion greater than 60% of the total enrollment. The school board appealed the modification and we affirmed. *Id.* at 1440. *Davis* is wholly distinguishable from the present case. In *Davis*, the school board was still under the court's supervision with respect to the admission policy. Further, almost no time had passed since the creation of the court's plan—the plan was designed to begin in the 1981–1982 school year and was modified in 1982, and our ruling was issued in 1983. *Id.* at 1433–34, 1440. The situation in the present case is significantly different—the Consent Decree was issued in 1981, judicial supervision over CMMS was withdrawn in 1990, and there have been no subsequent findings of segregation or vestiges of past segregation or orders requiring the continued use of remedial racial classifications. In addition, in *Davis* the use of separate lists was explicitly part of the court-approved plan. In contrast, here the Consent Decree did not mandate, or even suggest, that the School Board use separate test-score ranking lists for blacks and whites; the use of separate

24

lists is directed by the School Board's own admission policy. *Davis*, therefore, is simply not applicable here.

### e. No Other Vestiges of Past Segregation

There is no evidence in the record of current segregation within the school system or at CMMS or vestiges of past discrimination.[14] The School Board thus fails to show that it has a "'strong basis in evidence' showing that a current social ill in

***

[14] At oral argument, counsel for the School Board suggested two vestiges of past segregation: the fact that the school system still has several one-race schools and the test-score disparity between white and black students. As this "evidence" is not in the record and was suggested for the first time at oral argument, it is not properly before us. *United States v. Simpson*, 334 F.3d 453, 454 n.1 (5th Cir. 2003).

Nevertheless, even if we were to consider the School Board's suggested vestiges, the School Board has not shown that the existence of the one-race schools and the test-score gap is *traceable to past segregation*. Regarding one-race schools, the Supreme Court has declared that "the existence of some small number of one-race, or virtually one-race, schools within a district is not in and of itself the mark of a system that still practices segregation by law." *Swann v. Charlotte-Mecklenburg Bd. of Ed.*, 91 S.Ct. 1267, 1281 (1971). For instance, in *Davis* we upheld a district court-created plan that left 11 one-race elementary schools. *Davis*, 721 F.2d at 1433. Furthermore, the 1981 Consent Decree *itself* explicitly recognized that the elimination of all one-race schools within the school system was not practicable: "The parties and the Court recognize that the elimination of all racially identifiable schools in the System is impracticable." "[T]he parties, after exploring all avenues to attempt to achieve desegregation in [certain] schools, have determined . . . that there is no feasible and practical means of accomplishing desegregation at those schools other than the actions [described concerning one-race schools]." "[T]here will remain under the provisions of this Decree a number of one-race or predominantly one-race schools which, for various reasons . . ., it is not practically possible to effectively desegregate given the current circumstances existing in Caddo Parish." The School Board has not shown in any way, particularly in light of the Consent Decree's language, how the continued existence of one-race schools is traceable to past segregation within the school system.

Concerning the test-score gap, the Board has produced no evidence and provided no analysis whatsoever regarding a causal connection between the gap and past *de jure* segregation. As "achievement gap statistics, by themselves, do not even eliminate the possibility that they are caused by what the Court terms 'societal discrimination,'" *Wessmann*, 160 F.3d at 803, the mere suggestion that the gap is a vestige of past discrimination is not sufficient. Moreover, it is obvious that virtually none of the students entering the eighth (or lower) grade for the 2002-03 school year was or had ever been a student at *any* school governed by the School Board when the 1990 Order was entered.

25

fact has been caused by such conduct." *Wessmann*, 160 F.3d at 800 (quoting *City of Richmond v. J.A. Croson Co.*, 109 S.Ct. 706, 725 (1989)).

### 2. No Other Compelling Interests

Besides relying on the 1981 Consent Decree, the School Board has not attempted to argue, or make any showing, that the racial classifications in its admission policy can be justified by some other compelling governmental interest. The magistrate judge also relied exclusively on the decree to uphold CMMS's admission policy, explicitly stating that it was not deciding, or being asked to decide, whether it could constitutionally order the implementation of the admission policy or whether the policy could withstand a constitutional challenge if the purpose was to achieve diversity[15] or some similar social goal.

The School Board's current policy is essentially a racial balancing quota. The 1981 Consent Decree no longer applies to CMMS, and racial balancing by itself is not a constitutionally

---

[15] The School Board has not claimed that its policy seeks to achieve diversity among the students at CMMS. The School Board has specifically limited its justification for the policy to the 1981 Consent Decree and expressly argued, in its briefs and at oral argument, that *Grutter* and *Gratz* are distinguishable and "very different" cases because they dealt with efforts to achieve *diversity* in the student body and not with a desegregation order to remedy past discrimination. Moreover, while student body diversity has been held a compelling state interest in the context of a law school, *Grutter v. Bollinger*, 123 S.Ct. 2325, 2339 (2003), it is by no means clear that it could be such at or below the high school level. *But see Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 377 F.3d 949, 964 (9th Cir. 2004) (applying *Grutter* to hold that diversity in the public high school context can be a compelling governmental interest). In any event, the quota system applied here would seem to clearly fail to pass muster under *Gratz v. Bollinger*, 123 S.Ct. 2411 (2003).

proper reason for employing racial classifications: "[T]he Court has consistently held that the Constitution is not violated by racial imbalance in the schools, without more." *Milliken*, 97 S.Ct. at 2757 n.14. *See also Freeman*, 112 S.Ct. at 1447 ("Racial balance is not to be achieved for its own sake. . . . Once the racial imbalance due to the *de jure* violation has been remedied, the school district is under no duty to remedy imbalance that is caused by demographic factors.").

The School Board has failed to show any compelling governmental interest that it furthers by its racial classification. The policy is therefore unconstitutional.

**C.** **Narrowly Tailored**

Moreover, even if the 1981 Consent Decree were still in some respects applicable to CMMS, the School Board's policy is not narrowly tailored to remedy the present effects of past segregation, the compelling interest allegedly supported by the Consent Decree. In the context of remedying past discrimination, a narrowly tailored measure requires that the state actor consider the use of other race-neutral means. *Croson*, 109 S.Ct. at 729. Further, a quota system "cannot be said to be narrowly tailored to any goal, except perhaps outright racial balancing," *id.*, and "[r]acial balance is not to be achieved for its own sake." *Freeman*, 112 S.Ct. at 1447.

27

The School Board's policy is not narrowly tailored. "To be narrowly tailored, a race-conscious admissions program cannot use a quota system – it cannot 'insulat[e] each category of applicants with certain desired qualifications from competition with all other applications.'" *Grutter v. Bollinger*, 123 S.Ct. 2325, 2342 (2003) (quoting *Regents of Univ. of Cal. v. Bakke*, 98 S.Ct. 2733, 2761 (1978) (Powell, J.)). Further, there is no evidence that the School Board has considered any race-neutral means which might arguably result in an increase in the percentage of black students at CMMS.[16] Moreover, as the School Board cannot justify its outright racial balancing absent a showing of current effects of prior segregation, which it has not done, its use of a racial quota is improper. While "the use made of mathematical ratios" as "*no more than a starting point* in the process of shaping a remedy, rather than an inflexible requirement," might be appropriate in certain contexts, *Swann*, 91 S.Ct. at 1267 (emphasis added), the School Board's use of a racial quota supposedly pursuant to the 1981 Consent Decree but *more than twenty years after* the signing of the decree – and more than a decade after the 1990 Order – is

_____

[16] Some examples of race-neutral means that the Board might have considered include: recruiting highly qualified black students who might not otherwise apply to CMMS, employing programs in elementary schools to improve standardized test scores for potential but underachieving student applicants, or considering certain characteristics of the applicants' parents (such as socio-economic status, educational level, or number of parents in a student's home).

28

hardly a "starting point" and appears rather to be an improper "inflexible requirement."[17]

With respect to narrow tailoring, we also observe that the policy does not even follow the dictates of the 1981 Consent Decree itself. The Consent Decree did not expressly mandate the use of a race-conscious admission policy.[18] Although the Consent Decree did give a projected racial enrollment goal, all the measures that it specifically mentioned were race-neutral ones. The Consent Decree provided that the School Board would "establish an aggressive magnet *recruitment* program and [would] *permit* and *encourage* students to attend magnet schools using *every reasonable effort* to achieve the projected racial enrollment for each school." (emphasis added). The School Board was to use its "*best efforts* to attain the projected racial enrollments [for the magnet schools] . . . by

---

[17] The School Board does not see its use of racial quotas as a starting point and does not appear to have an end in mind. In an interrogatory, the Cavaliers asked the School Board to describe "any time limitation after which all consideration of race in the admissions policy at [CMMS] . . . will be discontinued, or any objective, which if attained, would cause all consideration of race in the admissions policy at [CMMS] to be discontinued." In response, the School Board simply stated that the "current policy will be followed as long as the policy is in effect. Whether the Board in the future may revise the policy calls for speculation." The School Board's policy clearly is not a starting point, and the consideration of race is not specifically and carefully limited, at least in the temporal respect, to some compelling interest.

[18] The School Board has admitted that the Consent Decree only *implicitly* mandates the use of a race-conscious admission policy. In response to the Cavaliers' request for any evidence that the School Board had received approval from the district court to use racial classifications, the School Board pointed to the 1981 Consent Decree and stated that it "consider[ed] it *implicit* in this Decree that magnet schools, because they do not enroll children on the basis of attendance zones, must use race conscious admissions policies in order to meet the required projected racial enrollments, and that race conscious admissions policies are permitted." (emphasis added).

*developing attractive programs* at [the magnet schools] and by *encouraging students* of both races to attend such schools and benefit from their programs." (emphasis added). The Consent Decree further explained that "magnet programs at particular schools *may be revised* in order to effectively provide for the recruitment and retention of students in the magnet schools and to achieve and maintain a desegregated enrollment." (emphasis added).

The Consent Decree did not mandate that the School Board employ a separate list/quota system or any other such race-conscious policy to arrive at the projected racial enrollment goal. Rather, the School Board was to use every reasonable effort and its best efforts to recruit and encourage students and to develop attractive programs and to revise the programs in order to achieve and maintain the desired level of desegregation. The School Board's use of a racial quota does not constitute any one (or a combination) of the actions expressly mandated by the Consent Decree. Moreover, the Consent Decree itself wholly terminated more than a decade ago as to the magnet schools.[19]

---

[19] A brief response to the dissent.

The dissent relies on the language in *Swann v. Charlotte-Mecklenburg Board of Education*, 91 S.Ct. 1267, 1276 (1971), and the similar language in the companion case of *North Carolina State Board of Education v. Swann*, 91 S.Ct. 1284, 1286 (1971), to the effect that "[s]chool authorities . . . might well conclude, for example, that in order to prepare students to live in a pluralistic society each school should have a prescribed ratio of Negro to white students reflecting the proportion for the district as a whole. . . . to do this is within the broad discretionary powers of school authorities . . . .". This language is the purest passing dicta. No such issue was even arguably before the Court or presented by the facts of either case; no authority whatever, legal or otherwise, is cited in support; and the statements made do not form any link in the chain of reasoning by which the Court arrived at the holdings it made in those cases.

Moreover, the cited language in *Swann* – particularly as applied to race based magnet school admissions – has clearly been superceded by that of *Adarand Contractors, Inc. v. Pena*, 115 S.Ct. 2097, 2111 (1995), and *Gratz v. Bollinger*, 123 S.Ct. 2411 (2003), the court stating in *Gratz*: "It is by now well established that '*all* racial classifications reviewable under the Equal Protection Clause must be strictly scrutinized.'" *Id*. at 2427 (emphasis added; quoting *Adarand*, 115 S.Ct. at 2097). The dissent's citation in this connection of *Washington v. Seattle School District No. 1*, 102 S.Ct. 3187 (1982), is similarly unpersuasive; indeed there the Court noted that "Appellants and the United States do not challenge the propriety of race-conscious student assignments for the purpose of achieving integration, even absent a finding of prior *de jure* segregation. We therefore do not specifically pass on that issue." *Id*. at 3196 n. 15.

 *Gratz* applied strict scrutiny notwithstanding the presence of a compelling state interest. Even prior to *Gratz*, lower courts had applied strict scrutiny to use by educational authorities of race based preferences as remedial measures for past discrimination. See, e.g., *Podberesky v. Kirwan*, 38 F.3d 147, 152-53 (4th Cir. 1994), *cert. denied*, 115 S.Ct. 2001 (1995). See also *Johnson v. Board of Regents*, 263 F.3d 1234, 1265 (11th Cir. 2001); *Eisenberg v. Montgomery County Public Schools*, 197 F.3d 123, 128-29 (4th Cir. 1999); *cf. Police Ass'n of New Orleans v. City of New Orleans*, 100 F.3d 1159, 1169 (5th Cir. 1996) ("Even assuming that the promotions were made to remedy specific past discrimination, the actions before us were not narrowly tailored, as required" by strict scrutiny). Indeed, the dissent seems to ultimately recognize all this (as well as the wholly unpersuasive nature in this context of the *Swann* passing dicta it quotes).

 The dissent errs in reliance on the holding in *Belk v. Charlotte-Mecklenberg Board of Education*, 269 F.3d 305 (4th Cir. 2001), exonerating the school board from damages for race-based admissions to a magnet school prior to the district court's dismissal of the underlying decree on the basis that the district was unitary. In *Belk*, unlike the situation here, there had been no prior order specifically removing the magnet schools from the extant desegregation orders. Of the six judges in *Belk* who voted for this holding (five judges would have held the board liable), four were of the view that the prior orders, *extant at the time for which damages were sought*, "specifically authorized the use of fixed ratios based on race in assigning students to magnet schools." *Id*. at 408 (opinion of Judge Motz) (and it is not clear that the other two judges in the six judge majority were not of the same view; see id. at 353-56, opinion of Chief Judge Wilkinson). *Belk* might be analogous to this case *if* this case involved a claim for denial of access to CMMS in, say, 1986. Rather, this case involves denial of access to CMMS more than a decade after the 1990 order entirely removing it from the *only* extant court order, and is hence analogous to *Wessmann v. Gittens*, 160 F.3d 790 (1st Cir. 1998), cited with apparent approval in Judge Motz's *Belk* opinion (269 F.3d at 410).

 Moreover, in view of the wording of the 1990 order – which expressly "terminated" the 1981 order (the only extant desegregation related order) "as to [the] magnet schools" and provided "the United States shall not be entitled to seek any further or additional remedy with respect to any of said magnet schools," it is wholly clear that there was no reasonable possibility whatever that the school board could be exposed to sanctions for post-1990 abandonment of its rigid racial quota magnet school admissions policy (which itself was never mandated by the 1981 decree). Finally, it is manifestly unfair and illogical to place on the plaintiffs the burden to prove that there was no conceivable justification for the board's use, over a decade after the 1990 order, of a rigid

31

## Conclusion

Based on the foregoing, we REVERSE and REMAND for further proceedings not inconsistent with this opinion.

REVERSED and REMANDED.

---

racial quota admissions system at CMMS, when the board had all the relevant data and resources but defended its action below only on the manifestly erroneous ground of compliance with the 1981 decree (see note 8 and accompanying test *supra*).

WIENER, Circuit Judge, dissenting:

The brooding omnipresence that overarches the panel majority's reversal of the district court is the unarticulated premise —— fatally flawed, I submit —— that the trial court's partial release of the consent decree vis-à-vis Caddo Magnet School, ipso facto voided the very programs and policies long employed by the school district to achieve that partial release. As I shall explain more fully below, I am compelled, with my utmost respect, to dissent.

If the school board had unilaterally adopted its racial-quota admissions policy for magnet schools anew —— after the Caddo Parish School District had been declared unitary (which it has not) or even after the court had ceased its supervision of the particular magnet school's student admissions policy under the consent decree (which it has) —— I would likely have no concerns about joining the majority's opinion. But that is not our case and thus not the framework within which we must review it. Rather than a brand-new, post hoc admissions policy, the plan that we must test for constitutionality is (1) a longstanding race-based admissions policy, (2) which has been "on the books" and consistently administered for many years, (3) pursuant to an existing consent decree, (4) as part and parcel of the school board's comprehensive and continuing efforts, specifically to comply with the district court's mandate to achieve a 50/50 ratio in the Magnet Schools and generally to eradicate all vestiges of past segregation. When we review the case in this framework —— as we must —— the school

board's discretionary decision to retain its magnet school admissions policy as an integral tool in the Board's ongoing struggle to achieve its court-ordered, yet-unrealized goal of total desegregation easily passes our scrutiny.

Cessation of court supervision of the magnet school aspect of the consent decree is not the equivalent of a court declaration that the persistent vestiges of more than a century of school segregation have ceased to plague a substantial majority of Caddo's minority school students. Although the Supreme Court allows district courts to discontinue supervision over some (but less than all) aspects of plans to achieve unitary status in historically segregated school districts, the Court has never ruled that such a partial release from supervision forecloses a school district's option to continue using the ensconced race-conscious policies that enabled it to achieve and maintain such status. To the contrary, the Court has consistently emphasized the importance of affording school districts maximum discretion and control over local schools, particularly with respect to remedying the vestiges of past segregation.[20] In fact, it has explicitly endorsed school districts' use of race-conscious policies.[21]

---

[20] See, e.g., Freeman v. Pitts, 503 U.S. 467, 490 (1992) (citing Dayton Bd. of Educ. v. Brinkman, 433 U.S. 406, 410 (1977)). See also Bush v. Orleans Parish Sch. Bd., 308 F.2d 491, 501 (5th Cir. 1962) ("When a case involves the administration of a state's schools, as federal judges, we try to sit on our hands.")

[21] See, e.g., Swann v. Charlotte-Mecklenburg Bd. of Educ., 402 U.S. 1, 16 (1971).

It is true, as the majority points out, that, as a general rule, Supreme Court precedent requires us to scrutinize race-conscious government policies strictly.  Nevertheless, race-based features of school districts' desegregation plans enacted pursuant to court order, such as the one here at issue, are afforded a special presumption that they address a compelling state interest — remedying the effects of past segregation — over and above the general deference that we accord local school districts' efforts to comply with each aspect of court-ordered desegregation plans.  Here, the 1990 consent decree expressly released Caddo Middle Magnet School ("Caddo Magnet") from further court supervision.  To this day, however, the school district as a whole remains bound under the consent decree, and the Board risks court sanctions if it does not make bona fide efforts to fulfill all its obligations under the order.  If, therefore, we were to prohibit the Board's continued use of those race-conscious policies that have long been in place, and at the same time were to threaten sanctions if the board does not continue its efforts to remedy the effects of past racial discrimination, we would be putting the Board in a classic "Catch-22" situation.  In consequence, our review of the Caddo Magnet admissions policy must take into account the timing and history of that policy and the circumstances under which the school district operates — and defer to local authority to the maximum extent of our authority.

Partial Unitary Status

35

The panel majority cites no Supreme Court pronouncements, (and I have found none) on the effect that a district court's declaring a school district "partially unitary" has on a school board's continued use of policies validly enacted and continually applied in compliance with a consent decree. Despite the majority's reliance on Freeman v. Pitts, that case addresses the equitable power of district courts to supervise continuing desegregation efforts, not the discretion of school boards to decide how to implement these efforts. The Freeman Court permitted district courts to relinquish control over local school districts gradually by declaring them unitary in increments, i.e., to release districts from the obligation to continue some discrete desegregation policies while continuing to address remaining vestiges of discrimination in other areas.[22] Significantly, this decision did nothing to diminish either the discretion of school districts to continue programs previously enacted pursuant to a consent decree or the deference we must afford to the districts' exercise of that discretion.[23] In fact, when the Court has taken up the issue of school board discretion to consider race in implementing a desegregation policy, it has acknowledged that board discretion to implement such policies exceeds the equitable power of the courts to order them to do so.

---

[22] Freeman v. Pitts, 503 U.S. 467, 491-2 (1992).

[23] See id.

36

School Board Discretion and the Use of Race

The Supreme Court's 1971 <u>Swann</u> decision highlighted the expansive discretionary power of school officials to remedy past segregation and contrasted it with the equitable powers of the courts:

> School authorities are traditionally charged with broad power to formulate and implement educational policy and might well conclude, for example, that in order to prepare students to live in a pluralistic society each school should have a prescribed ratio of Negro to white students reflecting the proportion for the district as a whole. To do this as an educational policy is within the broad discretionary powers of school authorities; absent a finding of a constitutional violation, however, that would not be within the authority of a federal court.[24]

---

[24] <u>Swann</u>, 402 U.S. at 16. The majority refers to this passage as "the purest passing dicta" and states that it forms no link in the chain of reasoning by which the Court arrived at its holding. I do not cite this language as the holding but for the same reason the Supreme Court included it: as an example of the contrasting powers of the courts and of local school districts. For this reason, I must also take exception to the charge that this language played no role in the reasoning of the Charlotte-Mecklenburg decision. This opinion addressed the equitable power of district courts to order school districts to institute a variety of programs to address past segregation, and made clear that this equitable power does not reach as far as the inherent power of school authorities. Certainly, language comparing courts' power to that of school authorities plays a role in the Court's effort to define the reach of district court's authority. I agree that this language was not central to the <u>North Carolina State Bd. of Educ. v. Swann</u>, 402 U.S. 43 (1971) decision, and accordingly do not cite that case as an example of the expansive power of school authorities. Despite these observations, — that the quoted language did not figure in the reasoning of the <u>North Carolina</u> decision or the ultimate holding of the <u>Charlotte-Mecklenburg</u> opinion — unlike the majority, I cannot imagine that a unanimous Court would unequivocally state — twice — that school districts have plenary power to institute race-conscious admissions program if it did not mean that school districts have this kind of authority. The language from <u>Seattle County Sch. Dist. No. 1. v. Washington</u>, 458 U.S. 457 (1982) and <u>Bustrop, Inc. v. Bd. of Educ. of City of Los Angeles</u>, 439 U.S. 1380 (1978), which I have cited below, only reinforces my point that the Supreme Court has repeatedly referred to the expansive power of local school authorities, and that we therefore owe a measure of deference to home-grown, race-conscious admissions plans when enacted pursuant to a consent decree. Inasmuch as the Supreme Court has never stated, even in dicta, what the majority holds, I do not think that this point undermines my analysis of the case.

In this decision and others, the Court endorsed local discretion to use racial balancing as a means of correcting inequities caused by de jure segregation, and it has never reversed itself on this issue.[25] In Washington v. Seattle School District No. 1, the Court struck down a citizen initiative enacted to prevent local school districts from implementing race-based student assignments to achieve formal racial balance goals.[26] The Court held that the citizen initiative violated the Equal Protection Clause because it forbade busing only for the purpose of achieving racial balancing in the schools and added: "It is undeniable that busing for integration — particularly when ordered by a federal court — now engenders considerabl[e] . . . controversy. . . .But in the absence of a constitutional violation, the desirability and efficacy of school desegregation are matters to be resolved through the political process."[27] In fact, the Seattle School District decision, along with then-Justice Rehnquist's decision in Bustrop, Inc. v. Board of Education of City of Los Angeles, upheld state decisions to assign students based on race despite the absence of

---

[25] See id. See also Freeman, 503 U.S. at 497 ("Racial balancing in elementary and secondary school assignments may be a legitimate remedial device to correct other fundamental inequities that were themselves caused by the constitutional violation.").

[26] 458 U.S. at 471-74.

[27] Id. at 473-74.

any court order requiring the district to integrate its schools, i.e., as a <u>discretionary</u> remedy for past segregation.[28]

In addition, the Court has repeatedly stressed the importance of local control over schools. The <u>Freeman</u> Court explained that courts should withdraw supervision of school districts as quickly as possible because "local autonomy of school districts is a vital national tradition."[29] Courts have likewise emphasized the importance of maximum local responsibility for crafting integration strategies.[30] As noted above, the <u>Swann</u> Court expressly approved a school district's <u>discretion</u> to use a prescribed racial ratio to this end, even though it expressed doubt whether a federal court could <u>order</u> the district to do the same.[31]

Strict Scrutiny

---

[28] <u>Seattle School Dist.</u>, 458 U.S. at 474 (assuming that school board had the power to order race-based student assignment and busing, even though school system was not under court order to desegregate); <u>Bustrop</u>, 439 U.S. at 1383(upholding California state courts' desegregation order, including extensive busing and race-based school assignments, as not "required" but certainly "permitted" by the U.S. Constitution). <u>See</u> <u>also</u> <u>Swann</u>, 402 U.S. at 16 (discussing "traditionally" broad power of school authorities to formulate policies that would not be within the power of a federal court to order).

[29] <u>Freeman</u>, 503 U.S. at 490 (citing <u>Dayton Bd. of Educ. v. Brinkman</u>, 433 U.S. 406, 410 (1977)). <u>See</u> <u>also</u> <u>Milliken v. Bradley</u>, 418 U.S. 717, 741-42 (1974)("No single tradition in public education is more deeply rooted than local control over the operation of schools; local autonomy has long been thought essential both to the maintenance of community concern and support for public schools and to quality of the educational process."); <u>San Antonio Indep. Sch. Dist. v. Rodriquez</u>, 411 U.S. 1, 42 (1973)("This case . . . involves the most persistent and difficult questions of educational policy, another area in which this Court's lack of specialized knowledge and experience counsels against premature interference with the informed judgments made at the state and local levels.").

[30] <u>Swann</u>, 402 U.S. at 15; <u>Belk v. Charlotte-Mecklenburg Bd. of Educ.</u>, 269 F.3d 305, 401 (4th Cir. 2001).

[31] <u>Swann</u>, 402 U.S. at 16.

Certainly, the Court's more recent <u>Croson</u> and <u>Grutter</u> decisions have clarified our duty to scrutinize government use of racial classifications strictly for both a compelling state interest and narrowly tailored means to achieve the goal of such classification.[32]  I am convinced that, under the instant circumstances, the Caddo Magnet policy satisfied both at the time of its promulgation; and more to the point, does nothing to require us to test the <u>continued</u> employment of that policy, post-supervision, under the strict scrutiny rubric.

A.  <u>Compelling State Interest</u>

It is well established that remedying the present effects of past discrimination is a compelling state interest.[33] As the panel majority notes, Caddo Parish School District has been previously adjudged dual, i.e., guilty of discrimination.  The continued existence of a consent decree imposed pursuant to a judicial finding of past <u>de jure</u> segregation, even if now only partially enforceable, is nonetheless <u>prima facie</u> evidence of the continued existence of the effects of past discrimination.  This is so for several reasons, even with respect to a consent decree that remains only partially in effect.

---

[32] <u>Grutter v. Bollinger</u>, 539 U.S. 306, 326 (2003);  <u>Croson v. City of Richmond</u>, 488 U.S. 469, 493 (1989).

[33] <u>Dallas Fire Fighters Ass'n v. City of Dallas</u>, 150 F.3d 438, 441 (5th Cir. 1998).

First, a formerly dual school district is under a continuing duty to "take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch."[34] Persons subject to such an injunctive decree of a court of competent jurisdiction are expected to obey that order until it is modified or reversed.[35] This holds true even if the order compels violation of another statute —— or the Constitution for that matter.[36] Declaration of partial unitary status cannot be read to modify, much less repeal, the substantive elements of the order such that the school district is no longer required to take all efforts to comply with it, even if those efforts might otherwise violate the law.

Second, school districts under court order to remedy past segregation should not first be forced to consider race and undertake race-conscious policies to the point of achieving partial unitary status, only to be forced at that time either to abandon these policies immediately or to conduct extensive studies to prove a direct correlation between the policy and some aspect of their violation despite potential liability for their remaining obligations. The Supreme Court has observed that the indicia by

---

[34] Green v. School Bd. of New Kent County, 391 U.S. 430, 437–38 (1968).

[35] GTE Sylvania, Inc. v. Consumers' Union of United States, 445 U.S. 375, 386 (1980).

[36] GTE, 445 U.S. at 378 n.2; Walker v. City of Birmingham, 388 U.S. 307, 317 (1967).

which school districts are adjudged dual or unitary, such as one-race schools, segregated facilities, faculties, or student bodies, and the like, may be intertwined in such a way as to make the remedy for one effect of the constitutional violation effective to remedy other inequities.[37] Many school districts undoubtedly do not have the resources to produce direct evidence of the causes and effects of these interconnected factors, yet they could be sanctioned for failing to satisfy their obligations under such decrees.[38] For these reasons, at least until a district is declared fully unitary, we should accept the truism that a consent decree's requirement that the school district remedy past segregation is sufficient evidence that vestiges of past discrimination persist and, accordingly, that remedying them is a compelling governmental interest.

B.    Narrowly Tailored

The Caddo Magnet policy was validly enacted, i.e., narrowly tailored to achieve the goals of the consent decree, and it continues to meet the narrow tailoring requirement, even under the

---

[37] Freeman v. Pitts, 503 U.S. 467, 497 (1992).

[38] The majority states that it would be "manifestly unfair and illogical" to require the plaintiffs to prove that the Caddo Magnet admissions policy was unjustified more than a decade after the 1990 order. On the contrary, I find it unfair and illogical that any plaintiff seeking admission to a magnet school that has as the very reason for its existence the court-ordered effort to desegregate Caddo Parish Schools, may force the Board to prove, as many times as there are plaintiffs, the justification for its policy while the district as a whole remains subject to court order. The fair thing to do, I believe, is to allow the district the presumption that its policy addresses a compelling state interest, at least until the district as a whole is no longer subject to court order.

partial consent decree.  Under the circumstances of this case,
viz., a school district's complying with the court's order to
remedy a past constitutional violation by, inter alia, achieving a
50/50 black-white student body in its magnet schools, we should
view with considerable deference the continuation of any policy
previously enacted and unswervingly administered — under years of
court observation — to bring the school district into compliance
with the court order.[39]

As recently as 2001, the Fourth Circuit in Belk v. Charlotte-
Mecklenburg Board of Education employed a "deferential" brand of
strict scrutiny when it held that a similar race-based admissions
formula for magnet schools did not violate the Constitution,
because it had been implemented pursuant to a consent decree and
had been sufficiently narrowly-tailored to fulfill the Board's
court-ordered obligations.[40]  The Belk court considered an
admissions lottery that allocated spots in a magnet school

---

[39] Some deference to the decisions of educational policy-makers, even when the court is strictly scrutinizing voluntarily-enacted race-conscious policies, is appropriate.  See Grutter v. Bollinger, 539 U.S. 306, 329 (2003) ("Our holding today is in keeping with our tradition of giving a degree of deference to a university's academic decisions, within constitutionally-prescribed limits.").

[40] Belk v. Charlotte-Mecklenburg Bd. of Educ., 269 F.3d 305, 354, 401 (4th Cir. 2001).  The majority takes issue with my reliance on Belk, arguing that this case is inapposite because there was no prior order removing magnet schools from the extant desegregation orders.  My reason for relying on Belk, however, is to counter the majority's holding that the Caddo Middle Magnet admissions policy was not narrowly tailored at the time of its promulgation.  Other considerations, such as our deference to school board authority, the school board's continuing duty to comply with its consent decree, and the use of race-conscious admissions policies at magnet schools to prevent them from undermining desegregation in the rest of the district — considerations to which the majority does not respond — support a holding that the policy continues to be narrowly tailored.

43

according to race.[41]  The Charlotte-Mecklenburg School district had created separate lotteries for black and non-black students in an effort to achieve racial balance in its magnet schools.  First, if a sufficient number of children of either race did not fill the quotas for the children's respective races, the Board would actively recruit children of the opposite race despite lengthy waiting lists for "majority" race spots.[42]  But then, if the Board could not successfully recruit enough children of the targeted race, the remaining open spots usually went unfilled.[43]  The Fourth Circuit concluded in two separate opinions that the Board's policy survived constitutional scrutiny, despite the fact that the relevant court order did not <u>require</u> the school district to use a race-based admissions policy.[44]

Four appellate judges held that the underlying court order's broad language commanding the district to take "whatever steps might be necessary to convert to a unitary system," together with the school district's discretion to maintain control over the racial composition of the schools, justified use of a quota.[45] Chief Judge Wilkinson, along with Judge Niemeyer, expressed strong disapproval of the use of quotas and doubted that the Board's

---

[41] <u>Belk</u>, 269 F.3d at 316-37.

[42] <u>Id.</u>

[43] <u>Id.</u>

[44] <u>Id.</u> at 311.

[45] <u>Belk</u>, 269 F.3d at 401 (King, J. and Motz, J., concurring).

44

policy would survive if it were enacted voluntarily, <u>but reasoned</u> <u>that the school district was nevertheless entitled to flexibility</u> <u>in how it complied with a court order</u>:

> It is true that in the early 1990's, the school board in its magnet program eagerly accepted the courts' invitation to rely upon numerical benchmarks. I believe, however, that it is necessary to afford a school board some latitude in attempting to meet its desegregative obligations if we are not to undermine the rule of law. To do otherwise leaves the Board between a rock and a hard place. Namely, if the school board fails to carry out the court desegregation order, it can be cited for contempt or held not to have achieved unitariness. But if the Board acts aggressively to implement the court order, it risks facing judicial condemnation and the threat of litigation on the grounds that it was acting ultra vires. This is not the kind of quandary into which we should force institutions that are, for better or worse, under judicial decree.[46]

We know that here, as in <u>Belk</u>, the district court's 1990 consent decree did not mandate the precise quota policy here at issue, but broadly commanded Caddo Parish School Board to make "reasonable efforts" to recruit black students to its magnet schools. In so doing, however, the court did specifically decree that the targeted black-white enrollment ratio for the school should be 50/50, adding that this projected enrollment would be deemed satisfied if actual enrollment at Caddo Magnet was within plus or minus fifteen percentage points of the ratio mandated by the court for that school. Although the consent decree did not explicitly order Caddo Magnet to use a race-conscious quota

---

[46] <u>Belk</u>, 269 F.3d at 354. (Wilkinson, C.J., concurring).

admissions policy, it is indisputable that, given (1) the court's constitutional mandate for the Board to take whatever steps were necessary to fulfill its obligations, and (2) the Supreme Court's prior approval of quite similar race-conscious admissions policies, this was a reasonable and constitutionally-acceptable means for the Board to initiate and continue in its efforts to meet and maintain its court-ordered enrollment goals.[47]  Like the Belk policy, the Caddo Magnet policy was validly enacted as a narrowly tailored means of achieving the goals set forth in the consent decree.

Our own precedent supports affirming the district court's ruling that upholds the continued viability of Caddo's magnet school admissions policy.  Davis v. East Baton Rouge Parish School Board, for example, is apposite.[48]  Although, unlike the Caddo board, the Baton Rouge School Board was still under court order with respect to its magnet school admission policy, and although the time frame between the enactment of the decree and our review was narrower, the gravamen of our holding the Baton Rouge magnet schools admissions policy viable was that the quota would prevent the magnet schools from undermining desegregation in the parish as

---

[47] See Green v. County Sch. Bd. of New Kent County, 391 U.S. 430, 437-38 (1968) (holding that school boards previously operating state-compelled dual systems were "clearly charged with the affirmative duty to take whatever steps might be necessary to convert to a unitary system); Duvall County Sch. Dist. v. NAACP. 273 F.3d 960, 968 (11th Cir. 2001)(noting with approval that the school district, "while not contractually obligated to," capped white enrollment at magnet schools to promote integration).

[48] 721 F.2d 1425 (5th Cir. 1983).

a whole.[49]  Surely this rationale applies irrespective of whether all or any part of a school district remains under court order to desegregate ⸺ likely even after full unitary status is achieved, but certainly during the continuation of the status quo.

Neither can I agree that <u>Bryant v. Caddo Parish School Board</u>,[50] our earlier decision affirming the Western District of Louisiana's upholding of the self-same Caddo Middle Magnet admissions policy, is unpersuasive.  Regarding the panel majority's first concern ⸺ that the <u>Bryant</u> district court did not address <u>Freeman</u> ⸺ I have already noted that <u>Freeman</u> only spoke to the district court's <u>authority</u> to relinquish control in an incremental fashion; it said nothing about the <u>effect</u> of partial unitary status on a school district's power to craft its own policy.[51]

The majority's second concern ⸺ that the consent decree itself contemplated that the magnet schools would be released from the decree after fulfilling their obligations ⸺ also speaks to the discretionary authority of the school district to change the admissions policy when and if it determines that it is proper to do

---

[49] <u>Id.</u> at 1440. ("'The First Circuit has specifically approved application of a racial quota in admissions to magnet schools to ensure that they would not serve as a haven for those seeking to attend a school predominantly composed of those of their own race.' We agree.") (internal citations omitted).

[50] CV No. 95-0441 (W.D. La. Jan 3, 1997).

[51] <u>See</u> <u>infra</u> text accompanying notes 3-4.  <u>See</u> <u>also</u> <u>Freeman</u>, 503 U.S. at 489 ("A federal court in a school desegregation case has the discretion to order an incremental or partial withdrawal of its supervision and control.")

so.  It does not speak to any <u>obligation</u> to discontinue the policy, <u>ipso</u> <u>facto</u>, immediately on release from court supervision.

As regards the majority's third concern, it is true that the <u>stated</u> purpose of creating and operating magnet schools was to enhance the quality of education imparted to qualified students at those schools.  We recognized in <u>Davis</u>, however, that a primary purpose of racial quotas for magnet school admissions is to ensure that "voluntary attendance schools <u>not work to undermine</u> the progress of desegregation in the parish."[52]

As for the majority's belief that there is no clear relationship between the remaining deficiencies in the Caddo Parish School system and racial balancing at Caddo Magnet, the foregoing quotation from <u>Davis</u> clearly identifies a nexus between admissions policies <u>at</u> <u>magnet</u> <u>schools</u> and enrollment throughout a district. Although the Board no longer remains under court supervision with respect to racial enrollment projections, it does remain under court order with respect to one-race schools and majority-minority transfers.  Even if here the <u>Davis</u> nexus is slightly attenuated, it is not unreasonable to deduce that abolishing the magnet school admissions policy would likely "undermine" continuing efforts to remedy the broader problem of one-race schools.  <u>Freeman</u> itself acknowledged that racial balancing in student assignments may be a legitimate means to correct inequities <u>elsewhere</u> in a school system

---

[52] <u>Davis</u>, 721 F.2d at 1440(emphasis added).

that were also caused by a constitutional violation.[53] Eliminating all vestiges of prior segregation remains a court-ordered goal for the Board.

In the universe of narrow tailoring, magnet schools have been recognized by courts time and again as an effective and unobtrusive means for school districts to remedy vestigial effects of past segregation.[54] Congress itself has extolled the virtues of magnet schools as a means "to continue to desegregate and diversify schools . . . recognizing that segregation exists between minority and nonminority students . . [and that] [d]esegregation efforts through magnet school programs are a significant part of our Nation's effort to achieve voluntary desegregation. . ." in its Magnet Schools Assistance Program.[55] And, although Caddo Parish's partial unitary status includes Caddo Middle Magnet, the district as a whole has <u>not</u> been declared unitary as to remaining one-race schools, majority-to-minority transfers, and staffing. Even though

---

[53] <u>Freeman</u>, 503 U.S. at 497. The <u>Freeman</u> court ultimately found that there had been no showing that racial balancing was an appropriate mechanism to cure other deficiencies in the school system, but it acknowledged that the district court did not make specific findings and conclusions on that issue and remanded for further proceedings. <u>Id.</u> at 498. Further, the <u>Freeman</u> decision did not implicate the school board's discretion to use racial balancing to cure other deficiencies, but only the equitable power of the district court to order the Board to do so. <u>See id.</u> Finally, the issue in <u>Freeman</u> was whether race-based student assignments could remedy problems with faculty assignments, whereas Caddo Parish has not achieved unitary status in two other areas, including one-race schools and majority-to-minority transfers. <u>Id.</u>

[54] <u>See</u> <u>Milliken v. Bradley</u>, 433 U.S. 267, 272, 287-88 (1977); <u>Belk</u>, 269 F.3d at 355 (Wilkinson, C.J., concurring) ("Magnet schools are a widely used desegregation device.").

[55] 20 U.S.C. § 7231 (2002).

Caddo's magnet schools are no longer <u>compelled</u> to enroll majority and minority students according to the flexible ratio at issue, they were created, and continue to be used, "to enhance the quality of education and bring about a greater degree of desegregation."[56] The magnet school admissions policy certainly "fits" this goal.

<u>Conclusion</u>

The admissions policy at Caddo Parish was validly enacted to serve a compelling state interest and was narrowly tailored to achieve that interest, pursuant to a valid consent decree. The fact that the district court might no longer threaten the school district with sanctions if the magnet schools do not meet their projected enrollments does not mean that Caddo Parish must immediately scrap the race-based admissions policy for its magnet schools as part of its broader plan to desegregate. The Supreme Court has never spoken to the effect of partial unitary status on existing aspects and policies of the desegregation plan of an extant consent decree, but has emphasized the breadth of school district discretion and the importance of local control over schools. Consequently, our deference to a locally-accountable school board's decision to <u>continue</u> the use of a race-conscious admissions policy of which the supervising court was obviously aware for as long as it takes to eradicate the vestiges of

---

[56] 1981 Caddo Parish Consent Decree.

segregation is legally defensible despite the anathema of racial quotas generally.

Indeed, Supreme Court precedent, such as <u>Seattle School District</u> and <u>Bustrop</u>, indicates that the Court views even voluntarily-adopted race-conscious policies with a substantial degree of tolerance. We need not go that far, but neither should we retrench on Court precedent by unduly restricting school districts, especially those that continue to operate under court order. Our review of the instant policy should be considerably more deferential than the strictest of strict scrutiny, keeping in mind that the entire district remains under court order and that partial cessation of court supervision of this facet of magnet school admissions is <u>not</u> the equivalent of terminating the continuing presumption of deference to school boards by the courts.

I end where I began. If this Caddo Magnet racial-quota admissions policy were enacted unilaterally by the Board today, after the court has ceased supervision of the magnet schools, I could go along with the majority's strict scrutiny analysis and rejection of the quota system. But inasmuch as that policy was enacted pursuant to court order and has been in place for years under that order –– with court scrutiny and without court disapproval –– <u>and</u> the Board is still hard at the task of eradicating the pernicious effects of <u>de jure</u> segregation, I am convinced that the test employed in the majority's opinion is

51

inappositely stringent and thus, I respectfully submit, inapplicable <u>in this framework</u>.